# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*,
### 2012 IL App (2d) 110718

---

| | |
|---|---|
| Appellate Court Caption | ROBERT W. GAYLOR, JOANN A. GAYLOR, ROBERT E. GAYLOR, and MORNA GAYLOR, Plaintiffs-Appellants, v. CAMPION, CURRAN, RAUSCH, GUMMERSON AND DUNLOP, P.C., and LEE C. LOCKWOOD, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-11-0718 |
| Filed | November 15, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiffs waived any objection to the dismissal of the fraud count in their second amended complaint against defendants which alleged one count of legal malpractice and one count of fraud based on a transaction in which plaintiffs invested in a business venture to develop and sell electroluminescent technology, since plaintiffs filed a one-count third amended complaint alleging legal malpractice following the dismissal and that count did not refer to or adopt the dismissed fraud count, and the damage award for plaintiffs was not manifestly erroneous. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 04-LA-82; the Hon. Michael T. Caldwell, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Peter M. Katsaros and Laura A. Balson, both of Golan & Christie LLP, and Harry C. Lee, of Law Office of Harry C. Lee, both of Chicago, for appellants.

Christopher J. Graham, Dawn C. Wrona-Eby, and Joseph P. Kelly, all of Jones Lemon & Graham LLP, of Geneva, for appellees.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justice Birkett concurred in the judgment and opinion.
Justice McLaren specially concurred, with opinion.

**OPINION**

¶ 1      Plaintiffs, Robert W. Gaylor (Robert), Joann A. Gaylor, Robert E. Gaylor (Bobby), and Morna Gaylor, filed a two-count second amended complaint against defendants, Campion, Curran, Rausch, Gummerson & Dunlop, P.C. (the Campion firm), and Lee C. Lockwood, an associate attorney of the Campion firm, alleging legal malpractice and common-law fraud. The trial court dismissed the fraud count, and the matter proceeded to trial on plaintiffs' one-count third amended complaint alleging legal malpractice only. The jury returned a verdict in favor of plaintiffs and awarded them damages of $182,625. Plaintiffs appeal, arguing (1) that the trial court erred in dismissing their fraud count and (2) that the jury's determination of damages was manifestly inadequate and ignored proven elements of damages. For the following reasons, we affirm.

¶ 2                           BACKGROUND

¶ 3      The relevant background begins with the filing of plaintiffs' second amended complaint alleging legal malpractice and fraud. Plaintiffs alleged the same background facts in both counts. Plaintiffs owned and operated an excavating business and had used the Campion firm for various legal matters since 1998. In June 2002, Brian Bettis approached plaintiffs about the possibility of participating in a business venture to develop, manufacture, and sell electroluminescent technology (EL technology). Bettis represented to plaintiffs that he had obtained a number of patents for EL technology and that an Illinois corporation named ISD Technologies, LLC, in which Bettis and other investors were involved, currently owned the intellectual property rights and patents associated with EL technology.

¶ 4      Plaintiffs decided to participate in the EL technology venture with Bettis through a new company that would be called Ions, Inc. Plaintiffs and Bettis planned to transfer ISD Technologies' purported assets, including all intellectual property rights in EL technology,

-2-

into Ions. Bettis represented to plaintiffs that all of the present and future EL technology products would become the exclusive property of Ions. The contemplated products included a helmet kit, a safety vest, a backpack, a bicycle kit, and jewelry.

¶ 5 In their legal malpractice count, plaintiffs alleged that, beginning in early July 2002, they consulted with Mark Gummerson, a partner in the Campion firm, and told him of their business plans with Bettis. Plaintiffs sought Gummerson's legal advice in connection with the proposed transfer of ISD Technologies' purported assets to Ions. Gummerson referred plaintiffs to Lockwood, telling plaintiffs that this type of transaction was Lockwood's expertise. Bobby asked Gummerson whether separate counsel was necessary to represent plaintiffs and Bettis in the transaction, and Gummerson told plaintiffs that separate counsel was unnecessary.

¶ 6 Plaintiffs alleged that, leading up to the closing to finalize the transaction, plaintiffs informed Lockwood that their intention was for all of the EL technology ever developed by Bettis to become the sole and exclusive property of Ions. Plaintiffs also instructed Lockwood to draft an agreement that would require Bettis to transfer to Ions all intellectual property rights in all EL technology he developed, for 10 years from the date of the closing and for an additional 10 years pursuant to an automatic option to renew the agreement. Plaintiffs asked Lockwood numerous times whether he had in his possession the patents that Bettis had obtained in the EL technology, and Lockwood repeatedly indicated that he had them in his office.

¶ 7 Regarding the closing, which took place on October 10, 2002, plaintiffs alleged that Lockwood began by passing out the documents he had drafted. The closing was attended by plaintiffs; Bettis; Bettis's girlfriend, Sharon Munn; Bettis's son, Rocky Bettis; Rocky's girlfriend, Cathy; Bettis's daughter, Danielle; and Bruce Salk. Plaintiffs alleged, on information and belief, that Salk was an attorney representing himself and other investors in ISD Technologies. Plaintiffs' understanding was that Lockwood was representing plaintiffs and Bettis. Lockwood and Salk were the only attorneys present at the closing.

¶ 8 As he had prior to the closing, Bobby asked Lockwood if he had the patents that had been issued in Bettis's name. Lockwood could not find the patents. Someone telephoned patent attorney Thomas Vigil, who faxed to the closing a memo stating that he was preparing patent applications on Bettis's behalf but that he had not filed them. Lockwood, Bettis, Salk, and Munn all told plaintiffs that Bettis had "pending patent applications" in EL technology, and that the applications were "better legal protection" than patents.

¶ 9 Plaintiffs went through with the closing. Bettis signed a licensing agreement; however, the licensing agreement did not transfer intellectual property rights in EL technology as plaintiffs had desired. Instead, the licensing agreement gave Ions "an exclusive license to modify the EL products" and granted Ions "the exclusive right to sell the modified EL products to end users." Through the preorganization subscription agreement signed at the closing, shares of stock in Ions were to be issued to plaintiffs, Bettis, Munn, Mary Nelson, Rocky, and A&B Partnership.

¶ 10 Plaintiffs alleged that they had an attorney-client relationship with the Campion firm, Gummerson, and Lockwood. Plaintiffs further alleged that the Campion firm, Gummerson,

and Lockwood committed legal malpractice by, among other things, (1) failing to assign the matter to a qualified transactional attorney with expertise in patent law and contract drafting; (2) assuming multiple representations of clients with conflicting and adverse interests, without explaining the risks of doing so or obtaining conflict waivers; (3) failing to follow plaintiffs' instructions; and (4) failing to protect their clients' interests at the closing or in the EL technology. Plaintiffs alleged that they had incurred damages exceeding $400,000.

¶ 11    In their fraud count, which plaintiffs pleaded in the alternative to their legal malpractice count, plaintiffs began by alleging that there was no attorney-client relationship between plaintiffs and the Campion firm, Gummerson, or Lockwood. As they had in their legal malpractice count, however, plaintiffs alleged that, beginning in early July 2002, they consulted with Gummerson and told him of their business plans with Bettis. Plaintiffs alleged that it was only Bettis who sought legal advice from the firm. Nevertheless, Gummerson referred "plaintiffs and Bettis" to Lockwood and told them that this type of transaction was Lockwood's expertise. Bobby asked Gummerson whether separate counsel was necessary to represent "plaintiffs and Bettis" in the transaction, and Gummerson told plaintiffs that separate counsel was unnecessary.

¶ 12    As they had in their legal malpractice count, plaintiffs alleged that they informed Lockwood that their intention was for all of the EL technology ever developed by Bettis to become the sole and exclusive property of Ions. In addition, plaintiffs instructed Lockwood to draft an agreement that would require Bettis to transfer to Ions all intellectual property rights in all EL technology he developed, for 10 years from the date of the closing and for an additional 10 years pursuant to an automatic option to renew the agreement. However, plaintiffs alleged that Lockwood never informed plaintiffs that he and the Campion firm "could not work to realize their intentions because they were not acting as plaintiffs' attorneys."

¶ 13    Regarding the closing, plaintiffs alleged that they "relied exclusively on the factual representations" made by Lockwood "to lead them successfully through this complicated maze of legal documents." Plaintiffs' understanding at the closing was that Lockwood and the Campion firm were protecting plaintiffs' interests. Plaintiffs formed this belief based upon Gummerson's statement that separate counsel for plaintiffs was unnecessary, but Gummerson's statement was false.

¶ 14    Plaintiffs alleged that, in addition to misrepresenting that plaintiffs did not need separate counsel for the transaction, Gummerson, Lockwood, and the Campion firm made the following misrepresentations or omissions of material fact: (1) they failed to disclose that the Campion firm represented Bettis only; (2) they misrepresented that Lockwood was an expert in complex intellectual property transactions; (3) they misrepresented that Bettis owned patents in EL technology; (4) they misrepresented that the patents were physically present in the Campion firm's office; and (5) they misrepresented that pending patent applications offered better legal protection than patents. Plaintiffs relied on these misrepresentations or omissions in deciding to go through with the closing. Plaintiffs alleged that they had incurred damages exceeding $400,000, and they also sought damages for emotional distress and punitive damages.

-4-

¶ 15      Defendants moved to dismiss plaintiffs' second amended complaint, pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2006)). On April 25, 2008, the trial court struck several paragraphs of plaintiffs' legal malpractice count. In addition, the court struck plaintiffs' fraud count in its entirety. The court found that legal malpractice was "the gravamen of both counts" and considered the fraud count to be "a back door way to try to tack punitive damages onto a legal malpractice case." The court granted plaintiffs leave to file an amended complaint as to the legal malpractice count, but not as to the fraud count. The court indicated that plaintiffs were free to file a motion for leave to file an amended complaint as to the fraud count within 28 days of entry of the order.

¶ 16      Plaintiffs timely filed a one-count third amended complaint alleging legal malpractice only. The complaint contained no reference to the previously dismissed fraud count. On the same day, plaintiffs also timely filed a motion for leave to file a two-count third amended complaint alleging both legal malpractice and fraud. Plaintiffs attached to their motion a proposed amended complaint and stated in the motion that the proposed fraud count was set forth "just as it was set forth in the Second Amended Complaint." Plaintiffs contended that the count "state[d] a meritorious claim for fraud, pled in the alternative to their claim for legal malpractice." The trial court denied plaintiffs' motion for leave to file the third amended complaint containing the fraud count.

¶ 17      The matter proceeded to trial on plaintiff's third amended complaint containing the legal malpractice count only. Bobby testified that his friend Chuck August introduced him to Bettis sometime in June 2002 and that Bobby invested $20,003 in Bettis's EL technology venture in a "handshake deal." Bobby and Bettis made plans to develop EL technology through a newly formed corporation named Ions.

¶ 18      The testimony concerning plaintiffs' initial meetings with defendants was conflicting. Bobby, Robert, and Morna testified to meeting with Gummerson at the Campion firm in either late June or early July 2002, and all three recalled Gummerson saying that he would be able to represent plaintiffs and Bettis in the Ions transaction. Bobby, Robert, and Morna also testified to a second meeting with Gummerson that took place sometime in July 2002, at which Gummerson assigned the matter to Lockwood, stating that this type of transaction was Lockwood's expertise. Gummerson denied meeting with plaintiffs in either June or July 2002. Lockwood admitted to meeting with Bobby, August, and Bettis on July 12, 2002; however, he testified that Bobby was there only because he was a party to the Ions transaction, not because he was a client. Lockwood also testified to meeting with plaintiffs on two occasions in late July 2002.

¶ 19      Bobby testified that, prior to closing the Ions transaction, plaintiffs invested additional money with Bettis. On July 25, 2002, plaintiffs deposited $11,000 into a bank account created for Ions, to be used toward payment of business expenses. Plaintiffs also gave Bettis $3,000 on October 3, 2002, for Bettis's personal use because "he was short of money and pretty hard up." Copies of these checks were admitted into evidence.

¶ 20      Bobby testified that, in early October 2002, approximately one week prior to the closing, he had a 3½ hour meeting with August in the basement conference room of the Campion firm. He testified that Lockwood was in and out of the meeting. He further testified that he

asked Lockwood to get the patents and that, as before, Lockwood told Bobby that the patents were "upstairs." August testified that he recalled the early October 2002 meeting and that the "one key point" at the meeting was the patents. Lockwood denied meeting with Bobby or August in early October 2002. A fax from Lockwood to plaintiffs, dated October 10, 2002, was admitted into evidence. The fax cover sheet contained the following message: "Enclosed you will find a Preorganization Subscription Agreement, a Buy-Sell Agreement, a Licensing Agreement, and a Put Option, which I presume to prepare on your behalf."

¶ 21    Regarding the closing, Bobby testified that it lasted approximately 4½ hours on the afternoon of October 10, 2002. He testified that Lockwood passed out the closing documents and began explaining them but that Bobby interrupted Lockwood to ask where the patents were. According to Bobby, Lockwood said that they were "upstairs" and that he would have someone bring them down. Eventually, Lockwood left the closing room to join in the search. After 20 to 25 minutes, Lockwood returned and said that he could not find the patents. Bobby testified that he said he would not close the deal unless he could see the patents with Bettis's name on them.

¶ 22    Bobby testified that Lockwood then called Vigil, who faxed a document to the closing that stated: "I have been retained by Mr. Brian Bettis to prepare and file three patent applications identified below." Lockwood then called Vigil on speaker phone in the closing room. According to Bobby, Vigil said that Bettis had patents pending, not patents.

¶ 23    Bobby testified that either Bettis or Vigil stated that patents pending can be better than patents. According to Bobby, Lockwood agreed with this statement. Bobby testified that either Bettis or Vigil explained that patents pending were better because the patent applications were confidential, while the contents of the patent applications would become public after the patents were granted. Vigil testified that he explained during the conference call that the patent applications were drafts that had not yet been filed. Vigil also testified that he would not have said that patents pending were better than patents.

¶ 24    Bobby testified that he said to Lockwood, "As my attorney, are you telling me that this is what I need to close?" According to Bobby, Lockwood said, "Yes, close the deal," and Bobby relied on his advice. Lockwood denied saying that a patent pending was better than a patent. He also testified that Bobby never asked him, "As my lawyer, should I close?" According to Lockwood, he told Bobby at the closing that he did not represent him and that he represented Bettis only.

¶ 25    At the closing, plaintiffs paid $365,300 in checks, consisting of $150,000 paid to A&B Partnership, $91,850 paid to Mary Nelson, $41,750 paid to Munn, $35,000 paid to Corinne and Jordan Beller, $30,000 paid to Bettis, and $16,700 paid to Rocky. Copies of all of these checks were admitted into evidence. Also at the closing a licensing agreement was signed by which Bettis granted to Ions "an exclusive license to modify the EL Products" and "the exclusive right to sell the modified EL Products to end users." The term of the licensing agreement was 10 years, which would be followed by an additional 10-year term at Bettis's option. The recitals section of the licensing agreement stated that Bettis held "various patents" in EL technology.

¶ 26    Bobby, Robert, and Morna testified regarding their efforts to develop the Ions business

following the closing, which were hampered by Bettis becoming "missing in action." Bobby testified that Vigil came up with the idea of having Bobby and Robert sign the patent applications as co-inventors. Vigil testified that plaintiffs finally got in touch with Bettis and that Bettis signed declaration pages for the patent applications in February 2003. Vigil further testified that he filed the patent applications with Bobby's and Robert's signatures as co-inventors on February 24, 2003, and that Bettis contacted him soon afterward with concern over the added signatures. Vigil testified that, ultimately, he filed amended applications on May 1, 2003, with Bettis's signature alone, but that no patents were ever issued for EL technology, because Bettis abandoned the refiled applications. Bobby testified that he paid Vigil $16,000 for his work on the patent applications. Morna testified that plaintiffs also had deposited a check for $10,000 into the Ions bank account on October 31, 2002. Copies of both checks were admitted into evidence. Bobby testified that plaintiffs decided to end their involvement with Ions after receiving a letter in March 2003 from an attorney in California whom Bettis had retained.

¶ 27    Following the closing plaintiffs received two letters from Gummerson on behalf of the Campion firm, both of which were admitted into evidence. The first letter, dated November 8, 2002, addressed several issues that Bobby had raised concerning the closing, then stated: "Although our firm has represented you in the past, and we hope to have a long, continuing relationship with you, for the transaction that was just concluded we were hired to represent Brian Bettis' interests, and we clearly communicated that to you on several occasions, including the closing." The second letter, dated April 24, 2003, stated: "As you are aware, significant disagreements have arisen between the directors and shareholders of Ions, Inc. subsequent to the transaction wherein you purchased stock of Ions, Inc. from Brian Bettis. During that transaction, as you are also aware, we represented only Brian Bettis ***." The letter concluded: "Because we consider Chuck August, Brian Bettis and you to be clients, we must regretfully terminate our representation of the corporation in this matter, due to the conflicts which have arisen."

¶ 28    The only expert witness to testify was plaintiffs' retained expert witness, Dean Small. Small testified that he was a patent attorney with several years of experience overseeing complicated business transactions involving intellectual property. Small testified to his opinion that defendants fell below the standard of care for attorneys in their handling of the Ions transaction. He testified that the standard of care required defendants to perform due diligence on Bettis's purported patents prior to recommending to plaintiffs that they proceed with the closing. Small testified that, without due diligence, a buyer would not have the information necessary to determine an appropriate price for the intellectual property he sought to buy. Small further testified that defendants fell below the standard of care in identifying and informing plaintiffs of the nature and existence of the patents. Regarding the licensing agreement that defendants drafted, Small testified that it was defective for various reasons. Small testified that, to accomplish plaintiffs' objectives, defendants should have used an asset purchase agreement, which should have contained representations and warranties from the seller to the buyer. Finally, Small testified that defendants fell below the standard of care when they represented multiple parties at the closing without explaining the risks or obtaining waivers. This was improper because Bettis's interests as a seller of

intellectual property were adverse to plaintiffs' interests as buyers of that property.

¶ 29    The jury returned a verdict for plaintiffs. The verdict form contained spaces for four categories of damages. The jury awarded plaintiffs $182,625 in damages for out-of-pocket amounts plaintiffs paid at the closing. The jury awarded no damages for out-of-pocket amounts plaintiffs paid as their opening investment in the EL technology, for credit card expenses Bobby and Morna incurred to develop the Ions business after the closing, or for fees plaintiffs paid to Vigil for legal services following the closing. In addition, the jury answered "Yes" to a special interrogatory that asked whether plaintiffs had proven the existence of an attorney-client relationship between plaintiffs and defendants for the Ions transaction. After the trial court denied plaintiffs' motion for a new trial, plaintiffs timely appealed.

¶ 30                                    ANALYSIS

¶ 31    Plaintiffs argue on appeal (1) that the trial court erred in dismissing their fraud count and (2) that the jury's determination of damages was manifestly inadequate and ignored proven elements of damages. We address each argument in turn.

¶ 32                         Dismissal of Fraud Count

¶ 33    Plaintiffs argue that the trial court erred in dismissing the fraud count of their second amended complaint, because they were entitled, pursuant to section 2-613(b) of the Code (735 ILCS 5/2-613(b) (West 2006)), to plead legal malpractice and common-law fraud in the alternative.

¶ 34    We must first address defendants' waiver[1] argument. Defendants contend that plaintiffs waived any objection to the dismissal of the fraud count in their second amended complaint by filing their one-count third amended complaint, which did not refer to or adopt the previously dismissed fraud count. Plaintiffs contend that they preserved their fraud count for appellate review by filing a motion for leave to file a two-count third amended complaint containing the identical fraud count that the trial court had previously dismissed. Plaintiffs ask us to review *de novo* the dismissal of the fraud count. However, we agree with defendants that plaintiffs waived any objection to the dismissal of the fraud count.

---

[1]Our supreme court has emphasized that "waiver," which is the "intentional relinquishment of a known right," is not interchangeable with "forfeiture," which is the "failure to make the timely assertion of the right." (Internal quotation marks omitted.) *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). However, because our supreme court has used the word "waiver" in its *Foxcroft* (*Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150 (1983)) line of cases, we will abide by its choice. As Justice Warren D. Wolfson put it:

> "The pleading-over cases use the word 'waiver.' But waiver is the 'intentional relinquishment of a known right.' [Citation.] It would be more accurate to use the word 'forfeiture' since it is obvious that no actual waiver was intended by [plaintiffs]. We will, however, use the word 'waiver' to be consistent with the language in the decisions." *Zawadzka v. Catholic Bishop*, 337 Ill. App. 3d 66, 67 n.1 (2003).

¶ 35　　　"The rules governing the preservation of dismissed claims for purposes of appellate review are clear and well settled." *Bonhomme v. St. James*, 2012 IL 112393, ¶ 17. Our supreme court has held that, following entry of an order dismissing a complaint, if a party files an amended complaint that is complete in itself and does not refer to or adopt the prior pleading, the party has waived any challenge to the order dismissing the prior complaint. *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 154-55 (1983). The " 'earlier pleading ceases to be a part of the record for most purposes, being in effect abandoned and withdrawn.' " *Foxcroft*, 96 Ill. 2d at 154 (quoting *Bowman v. County of Lake*, 29 Ill. 2d 268, 272 (1963)). The *Foxcroft* rule promotes " 'the interest in the efficient and orderly administration of justice' " (*Bonhomme*, 2012 IL 112393, ¶ 28 (quoting *Foxcroft*, 96 Ill. 2d at 154)) by "ensur[ing] that the court and the defendant possess objective means of knowing with certainty which claims the plaintiff is pursuing, *** [and by] ensur[ing] that a cause proceeds to trial only on the claims contained in the final amended complaint." *Bonhomme*, 2012 IL 112393, ¶ 29.

¶ 36　　　A party has three methods available to it for avoiding waiver and preserving dismissed claims for appellate review. *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 719 (2010). First, a party can stand on the dismissed counts, take a voluntary dismissal of any remaining counts, and argue the matter at the appellate level. *Vilardo*, 406 Ill. App. 3d at 719. Second, a party can file an amended pleading that realleges, incorporates by reference, or refers to the dismissed counts. *Vilardo*, 406 Ill. App. 3d at 719. A "simple paragraph or footnote" is sufficient for this purpose. *Tabora v. Gottlieb Memorial Hospital*, 279 Ill. App. 3d 108, 114 (1996). Third, a party can perfect an appeal from the dismissal order prior to filing an amended pleading that does not refer to or adopt the dismissed counts. *Vilardo*, 406 Ill. App. 3d at 719.

¶ 37　　　The burden of preserving dismissed claims for appellate review "is not onerous." *Bonhomme*, 2012 IL 112393, ¶ 26 n.1. Therefore, where a party has failed to employ one of the above methods for avoiding waiver, "ongoing objections" to a dismissal order will not be sufficient to preserve the issue for appeal. *Bonhomme*, 2012 IL 112393, ¶¶ 20-22; *Boatmen's National Bank of Belleville v. Direct Lines, Inc.*, 167 Ill. 2d 88, 100 (1995). This is true even where a party raises objections to a dismissal order in a motion to reconsider, in a motion for a new trial, or in motions *in limine*. *Bonhomme*, 2012 IL 112393, ¶¶ 20-23; *Boatmen's*, 167 Ill. 2d at 100.

¶ 38　　　Plaintiffs' one-count third amended complaint did not refer to or adopt the previously dismissed fraud count in any way. Plaintiffs also did not stand on their dismissed count or perfect an appeal from the dismissal order prior to filing their one-count third amended complaint. Therefore, under the *Foxcroft* rule, plaintiffs have waived any challenge to the order dismissing their fraud count. They have "in effect abandoned and withdrawn" their fraud claim.

¶ 39　　　Had plaintiffs done nothing more than file their one-count third amended complaint, this case would be identical procedurally to *Foxcroft*, and our analysis would end here. However, this case contains a procedural twist. On the same day that they filed their one-count third amended complaint alleging legal malpractice, plaintiffs also filed a motion for leave to file a two-count third amended complaint alleging legal malpractice and fraud. The fraud count

in plaintiffs' proposed two-count third amended complaint was identical to the fraud count that the trial court had previously dismissed. Plaintiffs contend that, by seeking leave essentially to refile the previously dismissed fraud count, they avoided the consequences of the *Foxcroft* rule and preserved the count for *de novo* appellate review. We disagree.

¶ 40       Plaintiffs' actions were insufficient under existing case law to avoid waiver, because our supreme court's *Foxcroft* line of cases indicates that preservation results, not from the attempt to file an amended complaint that incorporates or references a previously dismissed count, but from actually filing such a complaint. See *Bonhomme*, 2012 IL 112393, ¶ 26 ("[I]f plaintiff wished to challenge on appeal the trial court's dismissal of her emotional distress and defamation claims, it was incumbent upon her to somehow reference or incorporate those counts in her third amended complaint [which was the final amended complaint actually filed in the trial court]."); *Foxcroft*, 96 Ill. 2d at 155 ("For the above-related reasons we adhere to this rule, and conclude that allegations in former complaints, not incorporated *in the final amended complaint*, are deemed waived." (Emphasis added.)). Here, plaintiffs never actually filed an amended complaint that incorporated or referenced the previously dismissed fraud count.

¶ 41       The special concurrence nevertheless concludes that plaintiffs preserved the fraud count for appellate review, reasoning that "the preservation of the cause of action comes from the attempt to file the amended complaint containing the [dismissed] cause of action, not from the trial court's decision to grant or deny leave to file it." *Infra* ¶ 81. The special concurrence suggests that, given what occurred here, we should treat as interchangeable the filing of a motion for leave to file an amended pleading and the actual filing of an amended pleading. We disagree with this reasoning. Again, our supreme court has indicated that preservation results from incorporating or referencing a previously dismissed count in the final amended pleading actually filed in the trial court. See *Bonhomme*, 2012 IL 112393, ¶ 23; *Foxcroft*, 96 Ill. 2d at 154 (stating that the court "perceive[s] no undue burden in requiring a party to incorporate *in its final pleading* all allegations which it desires to preserve for trial or review" (emphasis added)). Neither *Bonhomme* nor *Foxcroft* said that preservation can result from including a dismissed count in a *proposed* amended complaint that is never filed.

¶ 42       The special concurrence concludes that the trial court refused to allow plaintiffs to comply with *Foxcroft* and *Bonhomme* and that we should not fault plaintiffs for attempting, albeit unsuccessfully, to preserve the fraud count for appellate review. *Infra* ¶ 83. The special concurrence "find[s] it curious that abandonment of the count at issue is determined by unsuccessfully trying *not* to abandon it." (Emphasis in original.) *Infra* ¶ 83. In *Boatmen's*, our supreme court expressly rejected the special concurrence's reasoning. In holding that the plaintiff's continued objections to the trial court's dismissal order were insufficient to preserve the dismissed counts for appellate review, the court in *Boatmen's* emphasized that it "has rejected the notion that dismissed complaints may nevertheless be reviewed when a plaintiff does not manifest an intent to abandon the original counts." *Boatmen's*, 167 Ill. 2d at 100. Rather than base determinations of preservation and abandonment on a subjective analysis of a plaintiff's intent, our supreme court has instead opted for a clear, objective procedure that leaves no question in the minds of trial courts or reviewing courts as to whether a count has been preserved.

¶ 43 As to the special concurrence's position that the trial court refused to permit plaintiffs to comply with *Foxcroft*, the record shows otherwise. At the conclusion of the hearing during which the court dismissed the fraud count contained in plaintiffs' second amended complaint, the following exchange occurred:

"MR. KATSAROS [plaintiffs' attorney]: Just for the record, I want to point out that in Count II [the fraud count] we have pled that the Defendants were not the Plaintiffs' lawyers. Count II is clearly–

THE COURT: It's not sufficiently pled. It relies for its basis on the attorney/client relationship.

You can't do both.

If you want to pick it, you want to pick a theory you can proceed on, you can do one or the other. You can't do both.

MR. KATSAROS: We can plead fraud and abandon legal malpractice?

THE COURT: You may. It depends on how you plead it. You may be faced with an election of remedies. You may also be making a fatal mistake. I don't know.

MR. KATSAROS: You could just–I'm just trying to understand your ruling.

THE COURT: Understand this. I'm striking Count II. I'm not going to explain to you how to replead it.

MR. KATSAROS: Can I have 28 days to tender a replead–according to the instructions of the Court?

THE COURT: I'm not going to give you blanket leave to replead this complaint. I want you to make the motion. You can do that whenever you want."

As the transcript indicates, there was no discussion regarding a desire by plaintiffs to comply with *Foxcroft* or to preserve their fraud count for appellate review. Rather, the trial court indicated that, if plaintiffs were to decide to continue to pursue their fraud count, it wanted the opportunity to review an amended count before granting plaintiffs leave to file it. The trial court was expecting an amendment and gave no indication that it would prohibit compliance with *Foxcroft* if plaintiffs chose not to amend the fraud count. In plaintiffs' subsequent motion for leave to file the two-count third amended complaint, plaintiffs did not indicate that they wished to file the complaint for purposes of preserving the fraud count for appellate review. Rather, as if they were asking the trial court to reconsider its earlier dismissal order, plaintiffs argued in the motion that the dismissed count "state[d] a meritorious claim for fraud" and that they should be able to plead legal malpractice and fraud in the alternative because "their choice between two contradictory legal theories *** need not be made at the pleading stage, but rather at trial." In short, plaintiffs did not seek to comply with *Foxcroft* and *Bonhomme* and the trial court did not prohibit plaintiffs from doing so.

¶ 44 Plaintiffs contend that "they simply followed an order of the court" when they filed their one-count third amended complaint and their motion for leave to file a two-count third amended complaint. This is another argument that our supreme court has rejected. *Bonhomme*, 2012 IL 112393, ¶¶ 24-26; *Boatmen's*, 167 Ill. 2d at 99-100. Even if plaintiffs

were following the trial court's instruction, "plaintiff[s] could not treat that instruction as a license to ignore *Foxcroft*." *Bonhomme*, 2012 IL 112393, ¶ 26 ("[E]ven had the trial court instructed plaintiff to appeal the dismissal of her defamation and emotional distress counts only after filing her third amended complaint, her argument would remain unavailing." (Emphasis omitted.)). In *Boatmen's*, the trial court explicitly told the plaintiff that its actions were sufficient to preserve an objection to a dismissal order for appellate review. *Boatmen's*, 167 Ill. 2d at 100. The supreme court held that even this explicit instruction did not "preclude a finding of waiver." *Boatmen's*, 167 Ill. 2d at 100. The court stated that the "[p]laintiffs should not be excused from following rules intended to preserve issues for review by relying on a trial judge's erroneous belief that an issue was properly preserved for review." *Boatmen's*, 167 Ill. 2d at 100. If a plaintiff cannot rely on a trial court's explicit but erroneous assurance that an issue was preserved for review, then plaintiffs in this case should not be able to rely on the actions of a trial court that made no statement whatsoever regarding preservation of an issue for review. As discussed above, the record indicates that the trial court was expecting an actual amendment when it indicated that it would entertain a motion for leave to file an amended fraud count, not that the trial court was giving instructions or assurances concerning the preservation of an issue for appeal. Once plaintiffs knew that they would not be amending their fraud count, it was incumbent on them–not on the trial court–to ensure that they followed appropriate procedures to preserve the previously dismissed count for review by, for example, including in the one-count third amended complaint a footnote or some other reference to the dismissed fraud count.

¶ 45        We also decline to recognize plaintiffs' actions as a new method for preserving dismissed counts for appellate review, because, as we alluded to above, it would be inconsistent with our supreme court's *Foxcroft* line of cases and it would lead to confusion in trial courts rather than promote the efficient and orderly administration of justice. Through its "nearly 50 years of unbroken jurisprudence" on this issue (*Bonhomme*, 2012 IL 112393, ¶ 31), our supreme court has endorsed a simple method for preserving dismissed counts for appellate review: "[U]nless the amended pleading somehow incorporates or references the pleadings in the former complaint, 'a party who files an amended pleading waives any objection to the trial court's ruling on the former complaints.' " *Bonhomme*, 2012 IL 112393, ¶ 23 (quoting *Boatmen's*, 167 Ill. 2d at 99). The court has stated that it "perceive[s] no undue burden in requiring a party to incorporate in its final pleading all allegations which it desires to preserve for trial or review." *Foxcroft*, 96 Ill. 2d at 154. The payoff for adhering to this simple procedure is promotion of " 'the interest in the efficient and orderly administration of justice.' " *Bonhomme*, 2012 IL 112393, ¶ 28 (quoting *Foxcroft*, 96 Ill. 2d at 154). As discussed above, reference to a dismissed claim in a plaintiff's final amended complaint (actually filed in the trial court) gives "the court and the defendant *** objective means of knowing with certainty which claims the plaintiff is pursuing" and "ensure[s] that a cause proceeds to trial only on the claims contained in the final amended complaint." *Bonhomme*, 2012 IL 112393, ¶ 29.

¶ 46        Here, plaintiffs simultaneously filed a one-count third amended complaint alleging legal malpractice only and a motion for leave to file a two-count third amended complaint alleging legal malpractice and fraud. Once the trial court denied plaintiffs' motion, plaintiffs

proceeded to trial on their one-count final amended complaint. Plaintiffs did not file an amended complaint that, for example, contained a footnote referencing the previously dismissed fraud count. Plaintiffs' actions gave no objective indication of their intentions, to defendants or to the trial court. At best, plaintiffs' belief that they had preserved their fraud count was based upon their subjective interpretation of their actions. Were we to recognize plaintiffs' actions as a new method for avoiding waiver, we would generate confusion and complexity where the supreme court has endorsed clarity and simplicity. Given our supreme court's recognition of a clear, simple, and effective procedure for avoiding waiver, we see no reason to recognize plaintiffs' actions as a new method for preserving dismissed counts for appellate review.

¶ 47 Although we can review for an abuse of discretion the trial court's denial of plaintiffs' motion for leave to file the two-count third amended complaint containing the previously dismissed fraud count, we conclude that this does not save plaintiffs from the effects of their waiver under the *Foxcroft* rule. Ordinarily, the denial of a motion for leave to file an amended complaint is reviewed for an abuse of discretion. *Century-National Insurance Co. v. Tracy*, 316 Ill. App. 3d 639, 646 (2000). Here, as we have discussed, plaintiffs did not amend their previously dismissed fraud count in any manner. Rather, plaintiffs sought leave to refile the very fraud count that the trial court had previously dismissed as legally insufficient. Because it had already determined that plaintiffs' fraud count was defective, the trial court was justified in denying plaintiffs' motion on the basis that the "new" fraud count was unamended. If plaintiffs had sought leave to file a fraud count that was not identical to the previously dismissed count, but was actually amended, we would review the merits of the amended fraud count. In this case, however, because plaintiffs did not seek leave to file an amended fraud count, there was no amendment for the trial court, or for this court, to review.

¶ 48 Plaintiffs further contend that they preserved the fraud count for appellate review both by stating in their response to defendant's motion for summary judgment that they intended to preserve the fraud count for appeal and by objecting to the dismissal in their motion for a new trial. However, having failed to employ one of the three recognized methods for avoiding waiver under *Foxcroft*, plaintiffs could not preserve their fraud count by making ongoing objections to the dismissal order. See *Bonhomme*, 2012 IL 112393, ¶¶ 20-23; *Boatmen's*, 167 Ill. 2d at 100.

¶ 49 Our conclusion is supported by the consideration that plaintiffs' motion for leave to file an amended complaint containing the fraud count was in substance a motion to reconsider the dismissal order. "A motion is defined by its substance rather than its heading." *Langone v. Schad, Diamond & Shedden, P.C.*, 406 Ill. App. 3d 820, 829 (2010). As mentioned above, plaintiffs asserted in their motion for leave to file the third amended complaint that the fraud count in the attached proposed complaint was set forth "just as it was set forth" in the previously dismissed second amended complaint. Thus, plaintiffs' fraud count was not "amended." Instead, plaintiffs simply offered additional argument for why the court should not have dismissed the count. Again, our supreme court has held that a motion to reconsider a dismissal order is not sufficient to avoid waiver under *Foxcroft*. *Bonhomme*, 2012 IL 112393, ¶¶ 20-23; *Boatmen's*, 167 Ill. 2d at 100.

¶ 50     We note that, even if we were to conclude that plaintiffs successfully avoided waiver under the *Foxcroft* rule, we would still reject plaintiffs' argument that the trial court erred in dismissing the fraud count. Plaintiffs contend that they successfully pleaded legal malpractice and fraud in the alternative, because they pleaded legal malpractice based upon the existence of an attorney-client relationship and fraud based upon the nonexistence of an attorney-client relationship. We disagree. Plaintiffs pleaded essentially the same facts in both counts, but simply affixed different labels to them. This was not an appropriate use of alternative pleading. *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 760 (2008); *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 273-74 (1995); see also *Neade v. Portes*, 193 Ill. 2d 433, 445 (2000) ("While pleading in the alternative is generally permitted [citation], duplicate claims are not permitted in the same complaint.").

¶ 51     Even though plaintiffs began their fraud count by alleging that there was no attorney-client relationship between plaintiffs and the Campion firm, Gummerson, or Lockwood, which was a conclusory allegation, they went on to allege facts establishing an attorney-client relationship. For example, as they had in their legal malpractice count, plaintiffs alleged that, beginning in early July 2002, they consulted with Gummerson and told him of their business plans with Bettis. Plaintiffs alleged that Gummerson referred "plaintiffs and Bettis" to Lockwood. Plaintiffs further alleged that, when Bobby asked Gummerson whether separate counsel was necessary to represent "plaintiffs and Bettis" in the transaction, Gummerson told plaintiffs that separate counsel was unnecessary. These were essentially the same facts that plaintiffs alleged in their legal malpractice count to establish an attorney-client relationship. Merely by conclusorily stating that defendants were not actually their attorneys, plaintiffs did not plead an alternative set of facts.

¶ 52                                        Damages

¶ 53     Plaintiffs' second argument on appeal is that the jury's determination of damages was manifestly inadequate and ignored proven elements of damages. Plaintiffs further contend that they are entitled to a new trial on damages only. Defendants argue in response that plaintiffs have forfeited the issue on appeal and, alternatively, that the jury's damages award was well within the range supported by the evidence.

¶ 54     Once again, we first address defendants' forfeiture argument. Defendants contend that plaintiffs forfeited any objection to the jury's damages award by failing to raise the issue in their motion for a new trial. Plaintiffs maintain that they sufficiently raised the issue in their posttrial motion. Plaintiffs point out that, even though their posttrial motion "did not specifically request a new trial for damages on grounds of inadequacy," it did contain three paragraphs discussing the "conclusive" evidence of damages and state that, "despite the undisputed evidence of damages ***, the jury awarded [p]laintiffs only $182,650." Plaintiffs further point out that the trial court characterized these statements as argument when it said at the hearing on their motion, "[Y]ou didn't really mention it in your oral argument, but you did raise the issue in the post-trial motion that the damages were inadequate." Plaintiffs also point out that the trial court concluded that damages were "purely a jury call," before it denied plaintiffs' motion.

¶ 55        Illinois Supreme Court Rule 366(b)(2)(iii) (eff. Feb. 1, 1994) provides that "[a] party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion." Section 2-1202(b) of the Code (735 ILCS 5/2-1202(b) (West 2010)) further dictates that a posttrial motion "must contain the points relied upon, particularly specifying the grounds in support thereof, and must state the relief desired." Our supreme court has described the "threefold" purpose underlying Rule 366(b)(2)(iii). *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 349 (1980). First, the rule allows the trial court to review earlier decisions without the pressure of an ongoing trial. *Brown*, 83 Ill. 2d at 349. Second, the rule allows the reviewing court to ascertain from the record whether the trial court was afforded an opportunity to correct an alleged error. *Brown*, 83 Ill. 2d at 349. Third, the rule prevents litigants from stating mere general objections and then raising on appeal arguments that the trial judge was not given an adequate opportunity to consider. *Brown*, 83 Ill. 2d at 349-50. A litigant can satisfy the rule's specificity requirement by including in a posttrial motion "a simple, succinct statement of the factual or legal basis" for the party's contention of error. *Brown*, 83 Ill. 2d at 350. "A party seeking to preserve an issue for review must raise the issue with enough specificity and clarity to serve the purposes of Rule 366(b)(2)(iii)." *Ryan v. Katz*, 234 Ill. App. 3d 536, 542 (1992).

¶ 56        We agree with plaintiffs that they did not forfeit the issue of the sufficiency of the jury's damages award, because the purposes underlying Rule 366(b)(2)(iii) were adequately served. As plaintiffs point out, even though the argument section of their posttrial motion did not include a discussion concerning damages, the trial court characterized their discussion of damages as argument and addressed the issue at the hearing on the motion. Moreover, although plaintiffs did not cite authority to support their assertions that damages were inadequate, their discussion of damages did contain specific contentions regarding the inadequacy of the damages award. Plaintiffs discussed the "uncontradicted testimony" regarding their expenditures in connection with the Ions closing and asserted that "the evidence conclusively proved" damages totaling $422,490.38. Plaintiffs then asserted that, "despite the undisputed evidence of damages *** , the jury awarded [p]laintiffs only $182,650." Although it did so only minimally, plaintiffs' posttrial motion raised more than a general objection to the damages award, and it afforded the trial court an opportunity to determine whether an error had occurred. The trial court addressed the issue and found no error, concluding that damages were "purely a jury call." Given these considerations, we conclude that plaintiffs did not forfeit the issue for appeal.

¶ 57        We nevertheless reject plaintiffs' argument that the jury's damages award was manifestly inadequate and ignored proven elements of damages. As mentioned above, plaintiffs argue that, because the jury found that defendants were negligent, the jury "had no choice but to award $422,490.38," which is the total amount of damages that "proximately flowed" from defendants' negligence. Plaintiffs further argue that little deference is owed to the jury's determination of damages, because plaintiffs' damages were "fixed and liquidated" as shown by the undisputed checks introduced into evidence at trial.

¶ 58        Defendants argue in response that the jury's damages award was well within the flexible range supported by the evidence. In particular, defendants argue that the jury could have concluded that the $34,003 that plaintiffs invested in Bettis and Ions prior to the closing was

not proximately caused by defendants' negligence, because plaintiffs did not rely on defendants' advice in making these payments. Regarding the $365,300 that plaintiffs paid at the closing, defendants argue that the jury could have concluded that plaintiffs were not entitled to recover this entire amount, because there was evidence that plaintiffs did not walk away from the closing empty-handed. Defendants further argue that subsequent events, which were not reasonably foreseeable by defendants at the time of the closing, were ultimately what caused plaintiffs to lose their entire investment. Finally, defendants argue that the jury could have concluded that defendants owed plaintiffs no duty in connection with the postclosing expenditures totaling $23,187.38.

¶ 59     While the amount of a damages award is generally within the discretion of the jury, a new trial may be warranted (1) "if the damages are manifestly inadequate," (2) "if it is clear that proved elements of damages have been ignored," or (3) "if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff." *Merrill v. Hill*, 335 Ill. App. 3d 1001, 1006 (2002) (citing *Hollis v. R. Latoria Construction, Inc.*, 108 Ill. 2d 401, 407 (1985)). "Less deference is owed to the jury's award when damages in a fixed and liquidated amount are involved, in contrast, for example, to traditional personal injury damages." *Merrill*, 335 Ill. App. 3d at 1006. A reviewing court " 'will not substitute its judgment for that of the jury *** unless there is a lack of a reasonable basis for the verdict shown in the record.' " *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 766 (1994) (quoting *Hernandez v. Lukas*, 104 Ill. App. 3d 692, 694 (1982)).

¶ 60     If a court determines that a damages award was inadequate, it may order a new trial on all issues or, if certain criteria are met, a new trial on damages only. *Hollis*, 108 Ill. 2d at 408. A new trial on the issue of damages alone is warranted if (1) "the jury's verdict on the question of liability is amply supported by the evidence," (2) "the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant," and (3) "the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability." (Internal quotation marks omitted.) *Hollis*, 108 Ill. 2d at 408.

¶ 61     "A successful legal malpractice claim places the plaintiff in the same position that she would have occupied but for the attorney's negligence." *Nettleton*, 387 Ill. App. 3d at 749. This comports with the " 'general rule of [tort] damages,' " which is that " 'the wrongdoer is liable for all injuries resulting directly from the wrongful acts ***, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated.' " (Internal quotation marks omitted.) *Nettleton*, 387 Ill. App. 3d at 749 (quoting *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 543 (1996)). In a traditional legal malpractice case in which the plaintiff alleges that the defendant's malpractice caused the plaintiff to lose a cause of action, "an award of damages equal to the amount she did not receive as a result of the defendant's malpractice is necessary to place the plaintiff in the same position that she would have occupied had the defendant not been negligent." *Nettleton*, 387 Ill. App. 3d at 752. By contrast, where a legal malpractice plaintiff alleges that the defendant attorney's advice fell below the standard of reasonable legal services, "any damages which proximately flow from the client's acceptance

of that advice are recoverable in a negligence action against the attorney." *Metrick v. Chatz*, 266 Ill. App. 3d 649, 655 (1994). However, " 'Illinois has long recognized the applicability, in questions of damages, of the doctrine of avoidable consequences, which prevents a party from recovering damages for consequences which that party could reasonably have avoided.' " *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 356 (2010) (quoting *Maere v. Churchill*, 116 Ill. App. 3d 939, 946 (1983)).

¶ 62　　Proof of proximate cause requires proof of both "cause in fact" and "legal cause." *Union Planters*, 402 Ill. App. 3d at 343. Courts employ either of two tests to determine "cause in fact." *Union Planters*, 402 Ill. App. 3d at 343. Under the traditional "but for" test, " 'a defendant's conduct is not a cause of an event if the event would have occurred without it.' " *Union Planters*, 402 Ill. App. 3d at 343 (quoting *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 354 (1992)). Under the "substantial factor" test, " 'the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about.' " *Union Planters*, 402 Ill. App. 3d at 343 (quoting *Thacker*, 151 Ill. 2d at 354-55). Legal cause, on the other hand, " 'is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.' " (Internal quotation marks omitted.) *Union Planters*, 402 Ill. App. 3d at 343 (quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 456 (1992)). " '[A]n injury will be found not to be within the scope of the defendant's duty if it appears "highly extraordinary" that the breach of the duty should have caused the particular injury.' " *Union Planters*, 402 Ill. App. 3d at 343 (quoting *Lee*, 152 Ill. 2d at 456).

¶ 63　　We agree with defendants that the jury's damages award fell within the range supported by the evidence. Regarding the $34,003 in payments that plaintiffs made to Bettis and Ions prior to the closing, we agree with defendants that the jury reasonably could have concluded that defendants' negligence did not proximately cause plaintiffs to incur these expenses. Bobby testified that he gave Bettis $20,003 in a "handshake deal" prior to seeking legal advice from defendants. Bobby further testified that, on July 25, 2002, plaintiffs deposited $11,000 into a bank account created for Ions. Although plaintiffs had sought legal advice from defendants by this point, plaintiffs presented no evidence suggesting that they relied on defendants' advice in making the deposit. Finally, Bobby testified that he gave Bettis $3,000 on October 3, 2002, for his personal use because Bettis "was short of money and pretty hard up." Again, plaintiffs presented no evidence that they relied on defendants' advice in giving Bettis this money. Therefore, it was not against the manifest weight of the evidence for the jury not to award plaintiffs any portion of their preclosing investments as damages.

¶ 64　　Regarding the $365,300 that plaintiffs paid at closing, we also agree with defendants that the jury reasonably could have concluded that defendants' negligence did not proximately cause damages in this full amount. The evidence supported a range of smaller damages awards. Although plaintiffs contend that their payment of the entire $365,300 "proximately flowed" from their reliance on defendants' advice, proximate causation, as discussed above, requires proof of "cause in fact" and "legal cause." Regarding the "cause in fact" aspect of proximate cause, defendants point out that plaintiffs presented no evidence that they would not have gone through with the closing had defendants given them adequate legal advice. Although Bobby testified that he relied on Lockwood's advice that plaintiffs go through with

-17-

the closing, this testimony was not uncontroverted, as Lockwood denied that Bobby ever requested his advice regarding whether to close. Moreover, although Small testified to his opinion that the standard of care required defendants to advise plaintiffs not to go through with the closing, Small also testified that due diligence under the standard of care would have provided plaintiffs with the information necessary to determine an appropriate price for the intellectual property they sought to buy. Thus, while the jury could have determined based on the evidence presented that plaintiffs would not have gone through with the closing but for defendants' negligence, this was only one of several conclusions supported by the evidence. The jury reasonably could have concluded that, had plaintiffs received competent advice, they still would have gone through with the transaction but they would have paid less for what they received.

¶ 65   Similarly, while plaintiffs maintain in their brief that they left the closing as shareholders in a company with no value, plaintiffs offered no expert testimony to support this assertion. Plaintiffs offered no expert testimony that the pending patent applications were completely devoid of value. Additionally, plaintiffs' testimony that, as late as February 2003, they were still actively pursuing the Ions business suggests that the company had value. The jury reasonably could have concluded that defendants' negligence was not the "cause in fact" of damages in the amount of $365,300.

¶ 66   The jury also reasonably could have concluded that defendants' negligence was not the "legal cause" of damages in the full amount of $365,300. Again, legal cause is a question of the reasonable foreseeability of the injury when the negligent act occurs. *Union Planters*, 402 Ill. App. 3d at 343. Defendants elicited testimony suggesting that the Ions business ultimately failed after Bobby and Robert signed the patent applications as co-inventors and plaintiffs' relationship with Bettis deteriorated. In addition, Vigil testified that the reason no patents were ever issued for EL technology was that Bettis abandoned the refiled applications. Thus, even if the jury had determined that defendants' negligence was the cause in fact of plaintiffs' expenditure of the full $365,300, the jury still could have concluded that plaintiffs' ultimate loss of that entire investment was not reasonably foreseeable at the time of the closing and, therefore, that defendants' negligence was not the proximate cause of damages totaling $365,300. The jury could have concluded that it was not reasonably foreseeable that Bettis would become "missing in action," that Bobby and Robert would resort to signing the patent applications as co-inventors, or that Bettis would abandon the applications.

¶ 67   We further determine that the jury reasonably could have concluded that defendants' negligence was not the proximate cause of plaintiffs' postclosing expenditures relating to the Ions business. Regarding the $16,000 paid to Vigil for his work on the patent applications, plaintiffs again contend that this payment "proximately flowed" from defendants' negligence. However, given the testimony at trial, the jury need not have decided that plaintiffs would not have had to incur these attorney fees but for defendants' negligence. See *Nettleton*, 387 Ill. App. 3d at 752 ("[W]here a legal malpractice plaintiff alleges that the defendant's malpractice caused her to incur attorney fees, an award of damages equal to the amount of attorney fees she would not have had to spend but for the defendant's negligence is necessary to put the plaintiff in the same position she would have occupied had the defendant not been negligent."). Vigil testified that he had not yet filed the patent applications at the time of the

closing. Thus, even if defendants had given plaintiffs adequate legal advice at the closing, defendants still would have had to pay Vigil to finalize and file the patent applications. As discussed above, the jury need not have determined that plaintiffs would not have gone through with the closing but for defendants' negligence; instead, the jury reasonably could have concluded that plaintiffs still would have gone through with the closing but perhaps paid a lower price. Therefore, the jury's decision not to award $16,000 in damages for plaintiffs' payment to Vigil was supported by the evidence.

¶ 68 Regarding the remaining postclosing expenditures, totaling $7,187.38[2] and related to the development of the Ions business, it was also reasonable for the jury to conclude that defendants' negligence was not the proximate cause of these expenditures. Plaintiffs presented no evidence that, but for defendants' negligence, they would not have had to spend these funds to develop the Ions business. Even had defendants given plaintiffs competent legal advice, plaintiffs still may have gone through with the closing and incurred these expenses developing the business.

¶ 69 Based on the foregoing, we conclude that the jury's damages award was supported by the evidence, that it was not manifestly inadequate, and that the jury did not ignore proven elements of damages. Given our determination that damages were adequate, we need not address plaintiffs' argument that they are entitled to a new trial on damages only.

¶ 70                                                    CONCLUSION

¶ 71 For the above reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 72 Affirmed.

¶ 73 JUSTICE McLAREN, specially concurring.

¶ 74 I specially concur because, although I agree as to the result regarding the dismissal of the fraud count, I disagree with the analysis. In order to understand the context of the procedural posture of the case, I wish to restate the following procedural facts:

"The court granted plaintiffs leave to file an amended complaint as to the legal malpractice count, but not as to the fraud count. The court indicated that plaintiffs were free to file a motion for leave to file an amended complaint as to the fraud count within 28 days of entry of the order.

Plaintiffs timely filed a one-count third amended complaint alleging legal malpractice only. The complaint contained no reference to the previously dismissed fraud count. On the same day, plaintiffs also timely filed a motion for leave to file a two-count third amended complaint alleging both legal malpractice and fraud. Plaintiffs attached a proposed amended complaint to their motion, and stated in the motion that the proposed

_____

[2]This amount consisted of $2,634.46 in credit card expenses and other expenditures totaling $4,552.92 (plaintiffs deposited $10,000 in the Ions bank account on October 31, 2002, but withdrew the remaining $5,447.08 when eventually they closed the bank account).

-19-

fraud count was set forth 'just as it was set forth in the Second Amended Complaint.' Plaintiffs contended that the count 'state[d] a meritorious claim for fraud, pled in the alternative to their claim for legal malpractice.' The trial court denied plaintiffs' motion for leave to file the third amended complaint containing the fraud count." *Supra* ¶¶ 15-16.

¶ 75    I believe that the motion for leave to file the two-count third amended complaint, filed contemporaneously with or subsequent to the single-count third amended complaint that was filed in conformity with the trial court's order, was a valid attempt to preserve the fraud count. Or more precisely, the motion for leave to file is the antithesis of proof of an abandonment of the claim. The attempt to file the two-count amended complaint, in which the fraud count was not amended in any way, indicated that plaintiffs were attempting to keep intact the claim of error regarding the dismissal of the fraud count. Put another way, the pleading was unchanged because plaintiffs believed that there was no defect to cure and that the "amended" complaint stated a cause of action. See *Childs v. Pinnacle Health Care, LLC*, 399 Ill. App. 3d 167, 178 (2010) (wherein similar attempts were not deemed abandonments under *Foxcroft*). The majority determines that there is no abuse of discretion in denying leave to file when there has been no change in the pleading. Although it cites to no authority to support its conclusion that "[b]ecause it had already determined that plaintiffs' fraud count was defective, the trial court was justified in denying plaintiffs' motion on the basis that the 'new' fraud count was unamended" (*supra* ¶ 47), the majority apparently bases this conclusion on the "abuse of discretion" analysis as set out in *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 7 (2004), specifically, whether the new pleading "cures the defect."

¶ 76    The majority's conclusion that there was no abuse of discretion in denying the filing is based upon the fact that, because the fraud count had not changed, the proposed two-count third amended complaint could not possibly cure the defect. See *supra* ¶ 41. The majority is presuming that the previously dismissed fraud count was defective and, thus, without changes, it must be defective in the proposed pleading as well. The majority's *a fortiori* analysis presumes that the previously dismissed fraud count failed to state a cause of action in order to logically conclude that there was no cure if there was no change. The majority, by only looking at the amended pleading and determining that the fraud count was identical and, therefore, defective, is making, not an analysis, but a conclusion based upon a presumption. Again, the majority relates, "Because it had already determined that plaintiffs' fraud count was defective, the trial court was justified in denying plaintiffs' motion on the basis that the 'new' fraud count was unamended." *Supra* ¶ 47. The majority is concluding that a determination by a trial court can supplant a determination by a court of review as to the merits of a pleading. It is either experiencing a new form of denial as to a reviewing court's ability to consider the merits of a trial court's judgment, or it is basing its decision on the presumption that the trial court's judgment was correct in dismissing the *initial* fraud count. The majority then decides that, since the proposed fraud count was identical, it must be defective as well. I suggest that the majority's attempt to rationalize its presumptive conclusion is a circumlocution. I submit that, were the opposite presumption applied (that the previously dismissed fraud count was *not* defective), then the proper conclusion would

-20-

be that, if the fraud count was *not* changed, it would be an abuse of discretion *not* to allow the filing of the pleading.

¶ 77    I believe that the proper analysis should not be based upon either presumption. That would require this court to first determine, *de novo*, whether the previously dismissed fraud count was defective. If it were, a review of the new pleading would be based, not on either presumption, but on the merits of the fraud count in the proposed third amended complaint. The majority renounces this analysis, claiming that it would compromise or subvert the holding in *Foxcroft* and be contrary to the holding in *Boatmen's*.[3] However, as will be explained below, the failure to grant leave to file did not prevent appellate review, as the grant or denial of leave would have no effect on our authority to review the merits.

¶ 78    The majority claims that a portion of the transcript establishes that the trial court did not refuse to allow plaintiffs to perfect review of the fraud count. If that were the case, then I do not see why the trial court would have "indicated that, if plaintiffs were to decide to continue to pursue their fraud count, it wanted the opportunity to review an amended count before granting plaintiffs leave to file it." *Supra* ¶ 43. Thus, if plaintiffs wanted to stand on the count, what were they supposed to do? Change it in order to comply with the trial court's statement or let it stand and have its filing denied? The trial court told plaintiffs that they had to seek leave to replead, and now the majority is faulting them for doing so. Contrary to the majority's conclusion that plaintiffs did not comply with *Bonhomme* or *Foxcroft*, neither case contained such a factual prerequisite as was placed upon plaintiffs by the trial court in this case, and the majority has placed these plaintiffs in an impossible position by requiring compliance with the two cases while refusing to acknowledge the "procedural twist," as the majority has called it, which was neither reflected nor discussed in the two cases. *Supra* ¶ 39. Considering the totality of the record, it is patently clear that plaintiffs were attempting to comply with *Foxcroft*, *Bonhomme*, and the trial court's "suggestion" that leave be sought to file an amended fraud count. If the trial court was aware of the "twist" it placed upon the procedural posture of the case, it should have granted leave to file the two-count complaint, in order to perfect review, and then dismissed the fraud count as redundant.

¶ 79    After reviewing the previously dismissed fraud count, I determine (rather than presume, as the majority does) that it was defective. However, I would determine that it is immaterial whether the trial court abused its discretion in denying leave to file, because it would not affect our review of the merits of the first, second, or third amended complaint based upon the cases referenced in paragraph 81 below.

¶ 80    The majority is concerned that, in some manner or form, plaintiffs are flanking and flouting the *Foxcroft* holding. I disagree. Our supreme court recently stated in *Bonhomme*:

"We repeat, unless the amended pleading somehow incorporates or references the pleadings in the former complaint, 'a party who files an amended pleading waives any objection to the trial court's ruling on the former complaints.' [Citation.]" *Bonhomme*, 2012 IL 112393, ¶ 23.

---

[3]The majority later acknowledges such an analysis, though only as an "even if" alternative to its "presumption" analysis. See *supra* ¶¶ 50-51. I agree with the analysis contained therein.

¶ 81　　　In this case, unlike in *Bonhomme*, plaintiffs attempted to file an amended pleading preserving the dismissed cause of action. As the majority noted, a plaintiff may preserve a dismissed cause of action by filing an amended pleading that realleges, incorporates by reference, or refers to the dismissed count in as little as a paragraph or even a footnote. *Supra* ¶ 36. Here, plaintiffs did not merely refer to the dismissed fraud count in a footnote; they *included* the entire count, using the exact same language as they had before. While the trial court denied plaintiffs leave to file an amended pleading that contained the exact same count that was contained in the former complaint, the preservation of the cause of action comes from the attempt to file the amended complaint containing the cause of action, not from the trial court's decision to grant or deny leave to file it. This case is more in line with several cases wherein the plaintiff attempted to file an amended pleading but was denied leave to do so. In these cases, the appellate court determined that the denial of leave to file did not preclude appellate review, and there was no suggestion that the failure to obtain leave to file constituted an abandonment. *Silver Fox Limousine v. City of Chicago*, 306 Ill. App. 3d 103, 105-06 (1999) ("But the loss of the right of review of an earlier complaint is triggered by the *filing* of an amended complaint. Here, plaintiff was denied leave to file a second amended complaint. Under these circumstances, both complaints are properly before us. The question in this case is academic. The second amended complaint incorporates all the issues raised in the first. Only issues not preserved are deemed abandoned. *Boatmen's National Bank*, 167 Ill. 2d at 99." (Emphasis in original.)); *Russ v. Pension Consultants Co.*, 182 Ill. App. 3d 769, 774 (1989) ("[S]ince the court did not grant leave to file the second amended complaint, the plaintiff may properly seek review of the order dismissing the amended complaint as well as the order denying him leave to file the second amended complaint; and the adequacy of both complaints is properly before this court.") Thus, I would review the merits of the fraud count *de novo*, not for an abuse of discretion (as the majority does), and determine that the fraud count did not state a cause of action. See *Silver Fox Limousine*, 306 Ill. App. 3d 103; *Russ*, 182 Ill. App. 3d 769; see also *People ex rel. Madigan v. Tang*, 346 Ill. App. 3d 277, 282-83 (2004) ("Regardless, the claims dismissed in the first amended complaint would be subject to dismissal for the same reasons as the claims in the second amended complaint as discussed below. Thus, even if the claims were not waived, we would hold that they were properly dismissed."). In my view, it is immaterial, for purposes of preserving the fraud count for appellate review, whether the trial court abused its discretion in denying leave to file. Although the court should have allowed the filing of the pleading and then dismissed the fraud count with prejudice to perfect the issue for appellate review, we still have the authority to review the merits of the proposed third amended complaint, regardless of the denial. See *Silver Fox*, 306 Ill. App. 3d 103; *Russ*, 182 Ill. App. 3d 769. If the trial court committed error, it was in requiring leave to file an amended complaint and then not granting leave to preserve the error according to the majority's narrow interpretation that abandonment is the only result of a denial of leave to file. If plaintiffs had thereafter filed, or attempted to file, a new pleading that did not contain the defective fraud count, then the factual scenarios in *Foxcroft*, *Bonhomme*, and this case would be substantially the same. I submit that abandonment would be patent and based upon plaintiffs' volitional action or inaction. But the cases are substantially different, and, unfortunately, the majority fails to

recognize the difference.

¶ 82 The majority determines that *Foxcroft* has been violated because the fraud count was not included in the pleading that went to trial. The reason that it was not included was not that plaintiffs failed to include it, but that the trial court refused their request to allow them to do so. The concept of proceeding to trial "only on the claims contained in the final amended complaint" (internal quotation marks omitted) (*supra* ¶ 45) makes sense only if the plaintiff proceeded to trial on what he wanted to include in the pleading. Since plaintiffs were not allowed to file the proposed complaint that contained the dismissed fraud count, they were not allowed to proceed to trial on what they tried to preserve for appeal. "Proceeding to trial" is a collateral fact of no consequence, unless the plaintiff has not done anything to attempt to preserve an issue by including that which the plaintiff desires to adjudicate at trial. If the plaintiff attempts to do so, and he submits a pleading that includes a dismissed count, as instructed by the trial court, the trial court's refusal to allow preservation should not be deemed an abandonment under this concept as well.

¶ 83 *Foxcroft* held that abandonment was determined by what a plaintiff fails to do, such as failing to include a dismissed count in his most recent timely filing. Now, the majority has determined that, if one is denied leave to file a timely amended pleading that references or includes the dismissed count, the dismissed count will be deemed abandoned. I find it curious that abandonment of the count at issue is determined by unsuccessfully trying *not* to abandon it. More curious is that the *sine qua non*, the count at issue, was not merely mentioned in the proposed amended pleading, it was included virtually verbatim, in full compliance with *Foxcroft*. According to the majority, the only way to determine if a plaintiff has attempted to preserve an issue would be via an act of the trial court and not inaction on the part of the plaintiff. Here, only if the trial court had granted leave to file would the majority determine that plaintiffs had *not* abandoned the count at issue. *Foxcroft* and *Bonhomme* said that failure to include or reference the count was abandonment. Here, the count was included in the proposed amended pleading. *Foxcroft* and *Bonhomme* did not say that the trial court's denial of leave to file a pleading that satisfied the requirements of *Foxcroft* and *Bonhomme* was an abandonment by the plaintiff. The majority has effectively determined that, if you file an amended pleading without including or referencing a dismissed count, the trial court may prevent you from properly filing an amended complaint that follows the supreme court's strictures for preserving the dismissed cause of action, contrary to *Childs*, *Silver Fox*, and *Russ*, *supra*. Taking the majority's holding to its logical extreme, what would happen if the plaintiff in a different case filed a new inclusive amended complaint without leave of court? Would the amended complaint, which included the count at issue, be subject to a motion to strike? If it were, would the issue in the dismissed count be preserved? I submit that the majority would determine that there must be an abandonment because the process in *Foxcroft* was not followed.

¶ 84 The prior supreme court cases determined abandonment based upon the failure to somehow apprise the trial court that the plaintiff wished to preserve the dismissed count for review. The majority here has determined that, if a plaintiff fails to do exactly what the prior cases said would be evidence of an intent *not* to abandon, then the trial court's refusal to allow the plaintiff to attempt to preserve the issue by inclusion would constitute proof of

abandonment. The majority determines that *Foxcroft* and *Bonhomme* are binding precedent even though they are factually distinguished on at least one major point: the plaintiffs in *Foxcroft* and *Bonhomme* did not to seek leave to include the counts at issue in amended complaints. Neither *Foxcroft* nor *Bonhomme* considered the effect of a grant or a denial of leave to file an amended complaint containing the counts at issue. Thus, the majority has engrafted an additional "procedural twist" or convoluted conundrum to determining abandonment: a trial court's refusal to allow preservation of an issue constitutes abandonment. In *Foxcroft* and *Bonhomme*, the supreme court determined abandonment based upon what the plaintiff did or did not do. The majority has now enlarged the holdings to include what the trial court does or does not do as well. Whether the trial court does or does not grant leave is immaterial to ascribing actions to the plaintiff.[4] There is nothing in *Foxcroft* or *Bonhomme* that says that this mode or manner is the only way to preserve an issue, nor do they consider and discuss: (1) a factual situation where the plaintiff was denied leave of court to file that which those cases said was sufficient; or (2) whether the filing of the proposed pleading without leave of court would qualify as non-abandonment. I believe that it is reasonable to conclude that plaintiffs "somehow" incorporated the former pleading in the proposed new amended pleading that the trial court did not allow to be filed. Hence, I do not believe that the trial court or defendants were lulled into a belief that plaintiffs were abandoning the fraud claim. Further, I do not believe that *Bonhomme* would criticize the analysis that I have suggested.

¶ 85    The majority suggests that my analysis is neither contained in nor approved of by *Bonhomme* and, thus, the only way that plaintiffs could have preserved the issue for appeal was to include the fraud count or some reference to it in the new pleading filed. I submit that this begs the question. I submit that the reason that my analysis is not contained in *Bonhomme* is that Ms. Bonhomme did not attempt to file an amended complaint with the counts at issue included. Unless the supreme court is prescient, it would not have anticipated the scenario here, and, even if it did, its comments regarding a nonexistent scenario would have been *dicta*. Furthermore, if Ms. Bonhomme or plaintiffs herein had sought leave to file an amended pleading with the counts at issue included, and the trial court were to continue to strike the proposed pleading because it contained the language deemed necessary by the majority, and continued to do so *ad infinitum*, the "final pleading" would never be filed. I suspect that punishment for contempt of court, based upon plaintiffs' repeated attempts at filing, might give this court jurisdiction over the contempt, but jurisdiction to hold what? Plaintiffs should not be punished for attempting to somehow incorporate or reference the pleadings from the former complaint by including the fraud count in their proposed complaint. It would appear that the majority has held that, where the trial court told plaintiffs not to file a fraud count again, and plaintiffs incorporated the fraud count in the proposed amended pleading, plaintiffs have nowhere to go. According to the majority, plaintiffs were at the mercy of a trial court that refused to allow any pleading to be filed that had any

---

[4]Applying this same logic, it would appear that a trial court's refusal to allow an offer of proof would no longer be error but would constitute abandonment on the part of the profferer. See *People ex rel. Department of Transportation v. Kotara, L.L.C.*, 379 Ill. App. 3d 276, 284-85 (2008).

reference to the dismissed fraud count. The absurdity of such a rationale flies in the face of *Bonhomme*'s dictate that a plaintiff must "somehow" incorporate or reference the pleadings from the former complaint. Apparently, the majority believes that "somehow" means this way, and this way only, even if the trial court has declared that plaintiffs are not to proceed this way.

¶ 86      The reason that plaintiffs failed to "somehow" preserve the issue was *not* that they failed to try to do so, it was that the trial court refused their request to allow them to do so. Previously, abandonment was gleaned from what someone failed to do, or failed *to try to do*, such as failing to include a dismissed count in his most recent timely filing. Now, the majority has determined that, even if one *tries* to file a timely amended pleading that includes or references a dismissed count, and the trial court does not allow him to do so, the dismissed count will be deemed abandoned. Abandonment is determined by doing what? When one is prevented from filing a pleading in compliance with the strictures of the supreme court in *Boatmen's, Foxcroft, and Bonhomme* in order not to abandon it.[5]

---

[5]I believe that the majority has committed the same mistake of logic as arose in *Sunbelt Rentals, Inc. v. Ehlers*, 394 Ill. App. 3d 421 (2009). The *Sunbelt* court decided that the supreme court had abandoned the legitimate business interest test, because it had not mentioned the test in *Mohanty v. St. John Heart Clinic*, 225 Ill. 2d 52 (2006). In *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶¶ 28-29, the supreme court determined to the contrary. The false logic that absence of evidence is evidence of absence is again upon the stage, acting to thwart the best laid schemes of mice and plaintiffs:

"But little Mouse, you are not alone,
In proving foresight may be vain:
The best laid schemes of mice and men
Go often awry,
And leave us nothing but grief and pain,
For promised joy!"

Wikipedia, *To a Mouse*, http://en.wikipedia.org/wiki/To_a_Mouse (quoting Robert Burns, To a Mouse (standard English translation) (1785)) (last visited October 24, 2012).