**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220133-U

Order filed May 11, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| JOHA REALTY, LLC, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant-Cross Appellee | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0133 |
| | ) | Circuit Nos. 18-L-409, 18-L-416 |
| JOLIET ONCOLOGY-HEMATOLOGY | ) | |
| ASSOCIATES, LTD., ALI LAKHANI, | ) | Honorable |
| ARVIND KUMAR, ELLEN J. GUSTAFSON, | ) | Barbara N. Petrungaro, |
| JASON SUH, WOODARD ABBOUD, and | ) | Judge, Presiding. |
| NAFISA D. BURHANI, | ) | |
| | ) | |
| Defendants-Appellees | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SARODE PUNDALEEKA M.D. | ) | |
| | ) | |
| Third Party Defendant. | ) | |
| | ) | |
| MIDWEST LEASING OF ILLINOIS, LLC, | ) | |
| and JEFFERSON LEASING, LLC, | ) | |
| | ) | |
| Plaintiffs-Appellants-Cross Appellees | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOLIET ONCOLOGY-HEMATOLOGY | ) | |
| ASSOCIATES, LTD. and PARAMJIT SIDHU, | ) | |
| | ) | |

Defendants-Appellees )
)
(Joliet Oncology-Hematology Associates, Ltd., )
Cross-Appellant). )
_____ )
JOLIET ONCOLOGY-HEMATOLOGY )
ASSOCIATES, LTD., )
)
Defendant-Third Party Plaintiff- )
Appellee, )
)
v. )
)
SARODE PUNDALKEEA, M.D., )
)
Third Party Defendant. )

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Brennan and Davenport concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court did not manifestly err when issuing its rulings on the plaintiffs'
complaints and the defendant's counterclaims.

¶ 2    After a bench trial, plaintiffs, JOHA Realty, LLC, Midwest Leasing of Illinois, LLC, and

Jefferson Leasing, LLC, appeal the Will County circuit court's decision finding that they did not

prove their claims against defendant, Joliet Oncology and Hematology, LLC (JOHA). JOHA

cross-appeals, arguing that the court erred in finding in favor of plaintiffs regarding its

counterclaim. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Although this litigation, on its face, is between limited liability companies, the litigants

once shared common owners, personnel, offices, and officers. Therefore, a thorough review of

the history of the intertwined companies, owners, and managers, is necessary.

2

¶ 5        Dr. Sarode Pundaleeka is a highly accomplished and enterprising physician. He served in multiple leadership roles in the medical community and successfully launched a thriving oncology and hematology medical practice: JOHA. He later created JOHA Realty to purchase and own office space for JOHA when it outgrew its location. He also created Midwest and Jefferson to lease medical equipment to JOHA.

¶ 6        When Pundaleeka first created these entities, he offered his partners in the medical practice the option of purchasing an ownership interest. All JOHA members were given an opportunity to invest in the other three entities (the "leasing entities"). Some JOHA members invested in at least one entity, but not all members invested. The ownership of the entities overlapped, but they were not identical. Pundaleeka was a member and manager of all entities.

¶ 7        From their inception until 2016, Pundaleeka was the president of all the companies, including JOHA. He had access to the bank accounts and managed all the businesses. He hired Paramjit Sidhu to help manage the companies while he remained president. Sidhu and Pundaleeka shared the same office within JOHA's space. For a time, Sidhu received no extra compensation for managing the various companies other than JOHA. He later shared a management fee with Pundaleeka and purchased an interest in JOHA Realty.

¶ 8        On December 27, 2011, JOHA entered into a personal service agreement (PSA) with Provena Hospital. Provena hired JOHA to perform medical services for the hospital. The PSA required JOHA to give up its ancillary services from which it derived a large portion of its revenue. The hospital conducted independent appraisals of the fair market value of the leases and offered to pay more than JOHA paid in its lease with JOHA Realty. Pursuant to the agreement, Provena assumed the property and medical equipment leases with the leasing entities. JOHA remained secondarily liable for the rent payments. Pundaleeka, on behalf of the leasing entities,

3

consented to Provena's assumption of the leases. At a subsequent meeting among the JOHA partners, they all agreed to accept an arrangement whereby the revenue from the leases would be added to an "income pool" from which they would calculate the JOHA partners' income. Shortly after Provena assumed the leases, JOHA passed a resolution establishing a new productivity model and determined how JOHA's income pool would be divided among the members.

¶ 9     After entering into the PSA, Provena initially made all of its payments for the PSA and the leases with the other entities by direct transfers into JOHA's bank account. JOHA then made payments to the leasing entities. The leasing companies, in turn, reimbursed JOHA for a portion of the lease payments. All these transactions took place in the same office at the same desk shared by Pundaleeka and Sidhu. Pundaleeka remained president of all the companies and signed some of the checks making these transfers. This practice went unchallenged for several years. From 2013 to 2016, Sidhu transferred approximately $92,000 annually from JOHA Realty to JOHA. The majority of Midwest's rent was transferred back to JOHA, while the remaining amount was paid to Pundaleeka as his management fee, a portion of which Pundaleeka shared with Sidhu. The amount paid back to JOHA from Jefferson increased every year until JOHA received approximately 94% of Jefferson's rental income in 2017.

¶ 10    During this time, Sidhu wrote the majority of the checks to JOHA. On the occasions when he was unavailable, he instructed staff members to prepare checks for Pundaleeka to sign. Pundaleeka did not question the contents of the checks. He was aware that some money was to be returned to JOHA based on his understanding of the financial agreements between JOHA and the other leasing entities.

¶ 11    In 2016, relationships soured between Pundaleeka and his partners at JOHA, and Pundaleeka left the company. His parting resulted in litigation in Will County and threatened

4

litigation in Cook County. He settled his personal claims with JOHA and executed a settlement release. In that release, he indicated he knew of no prospective claims against JOHA.

¶ 12    In May 2018, all three leasing entities ceased payment to JOHA, and JOHA Realty filed suit against JOHA alleging JOHA breached its leasing agreement. The complaint alleged that JOHA violated the terms of the parties' lease agreement by creating an underpayment when, after paying the monthly rent, Sidhu transferred approximately $7639.13 from JOHA Realty to JOHA every month for a total of 69 months, totaling $527,099.97 that should have remained in JOHA Realty's account. It sought to recover these funds, arguing that Sidhu did not have the authority to make the transfers of that amount. The complaint was later amended on September 4, 2019, to include a claim of unjust enrichment and a request for an alter ego declaratory judgment against the members of JOHA who did not have ownership interest in any of the leasing entities.

¶ 13    On November 12, 2019, JOHA and its named members filed a motion to dismiss the first amended complaint, which the circuit court granted. On March 23, 2020, JOHA Realty filed a second amended complaint against JOHA and its members. This complaint included claims of breach of contract, negligence, and unjust enrichment against JOHA and unjust enrichment against the members of the entity. In response, JOHA and its members filed a motion to strike, and in the alternative, dismiss all but the breach of contract claim. On August 17, 2020, the court entered an order which denied defendants' request to strike the complaint, granted the motion as to the unjust enrichment claim against JOHA members, dismissing the claim with prejudice, and denied the motion as to the other counts.

¶ 14    In October 2020, JOHA filed an answer to the remaining claims against it. In addition, it filed a counterclaim of breach of contract. The counterclaim argued that JOHA and JOHA Realty

had an agreement whereby JOHA Realty would pay JOHA the excess rent it received from Provena. When JOHA Realty stopped making such payments JOHA argued, JOHA Realty was in breach of the parties' agreement regarding who would receive Provena's excess rent payments. JOHA also filed a third-party complaint against Pundaleeka, alleging breach of contract as to the revenue sharing agreement related to the rents Provena paid as well as breach of the settlement and release agreement JOHA entered into with Pundaleeka in which he agreed to settle and release the entity and its members of all claims that were and could have been raised through the date of the execution of the agreement. JOHA Realty filed a motion to dismiss JOHA's counterclaim, which the circuit court denied.

¶ 15 Midwest and Jefferson also filed a suit against JOHA and Sidhu in May 2018, which was later consolidated with the JOHA Realty matter. Midwest and Jefferson alleged breach of fiduciary duty against Sidhu and unjust enrichment against JOHA. The first amended complaint filed on September 4, 2019, included claims of breach of fiduciary duty against Sidhu, breach of contract and conversion against JOHA, and unjust enrichment and a request for an alter ego declaratory judgment against the JOHA members that did not have ownership in the leasing entities. JOHA and its members filed a motion to dismiss the first amended complaint. The court denied the motion as to the breach of contract claim against JOHA and granted the motion as to all other counts. The unjust enrichment claims against JOHA's members were dismissed.

¶ 16 The second amended complaint filed by Midwest and Jefferson included claims of breach of contract and unjust enrichment against JOHA, fraudulent concealment against Sidhu, negligence against both Sidhu and JOHA, and unjust enrichment against JOHA's members. JOHA and its members filed a motion to strike or dismiss all counts except for the breach of contract claims. The court partially granted the motion. It dismissed the unjust enrichment claims

6

against the members and the negligence claims against JOHA and Sidhu with prejudice. The court denied the motion as to the fraudulent concealment claims against Sidhu and the unjust enrichment claims against JOHA.

¶ 17 JOHA filed a counterclaim against Midwest and Jefferson, alleging that Midwest and Jefferson, in their execution of consents to assignment and assumption of their leases, agreed to continue making payments to JOHA until the PSA expired. JOHA further alleged that it was not liable for the causes of action alleged in Midwest's and Jefferson's complaint, because the leasing entities had agreed to the transfers of those funds in the consent to assignment. JOHA sought indemnification from the allegations against it in Midwest's and Jefferson's complaint.

¶ 18 A bench trial began in February 2022. On February 3, Midwest and Jefferson filed a motion to voluntarily dismiss the fraudulent concealment claims against Sidhu with prejudice. JOHA Realty filed a motion to voluntarily dismiss the negligence claim pending against JOHA. At the time trial commenced, the only claims before the court were for breach of contract and unjust enrichment against JOHA. All other claims were previously dismissed.

¶ 19 At trial, Dr. Saoud Loutfi testified that he was a physician that worked for JOHA from 1996-2008. He was a member of JOHA Realty and Midwest but not JOHA. He testified that Sidhu handled the day-to-day business for JOHA Realty and Midwest. Sidhu's responsibilities included making sure the contract was properly applied, rents were received, and taxes were paid. Loutfi first learned that funds were being transferred to JOHA in 2018. Pundaleeka told him that large amounts of money had been transferred to JOHA without approval or documentation. Loutfi stated that Pundaleeka apologized and said he was working to repair the issue. He was never aware of the income pool resolution JOHA members passed in February 2012.

7

¶ 20 Dr. Natisa Burhani testified that she started working as a physician at JOHA in 1998 and was JOHA's president from 2019 to 2021. When JOHA Realty was formed, she was offered the opportunity to invest. She was also offered the opportunity to invest in Midwest and Jefferson but declined.

¶ 21 Burhani testified that she was not aware of any details regarding the agreements between JOHA and the leasing entities. Prior to her term as president, she was not aware of any funds being transferred from the leasing entities to JOHA. However, she was aware that JOHA should receive some money due to the agreement with Provena and the assumption of JOHA's lease. Her understanding was that the lease agreements between JOHA and the leasing entities had not changed. JOHA would receive the money from Provena, and it was JOHA's responsibility to pay the rent with those sums. She stated that in 2018 the excess rent payments that were paid to the leasing entities were not returned to JOHA, and JOHA was owed all the excess monies the other entities kept.

¶ 22 Burhani also testified regarding the settlement agreement between JOHA and Pundaleeka. In the agreement, Pundaleeka represented and warranted that there were no claims or potential claims against JOHA or its members that had not already been disclosed. She believed that this representation was inaccurate because Pundaleeka filed suit against JOHA on behalf of the leasing entities just a few months after executing the agreement.

¶ 23 Burhani stated that she had no knowledge of any of the JOHA members who also owned interest in one of the other leasing entities objecting to any of the payments made to JOHA. She was also not aware that any funds transferred to JOHA were in excess of what the leasing entities believed should have been transferred. She believed Pundaleeka was aware of the payments

8

because he was the manager of JOHA from 2012 to 2015 and was responsible for sharing the financials with JOHA's partners.

¶ 24        James Klockow testified that he was a certified public accountant that performed services for JOHA until 2020. He also prepared the tax returns for the leasing entities. If Klockow had any questions regarding the entities, he asked Sidhu because he was the administrator of the entities. It was Klockow's understanding that Pundaleeka was the tax partner for the entities and was responsible for preparing, signing, and filing the returns.

¶ 25        When Klockow first noticed check payments from Jefferson to JOHA, he asked Sidhu what it was and how to classify the payment. Sidhu told him to classify it as a rental adjustment, and Klockow did not ask for more information. He did not have any discussions with Pundaleeka regarding the rental adjustments. Klockow further stated that he saw the payments and transfers between entities but did not question whether the amounts were correct. He stated that he knew Pundaleeka had many business ventures during this time, and it was not unusual for him to see funds moving around between the entities.

¶ 26        Judy Franks testified that she was the payroll and accounts payable manager for JOHA from 2002 until 2021. Her role was to prepare payroll and process it through a pay service. She also reviewed the accuracy of invoices received. She stated that she reported to Sidhu, and Sidhu reported to Pundaleeka. She had never known Sidhu to act without first receiving approval from Pundaleeka.

¶ 27        Franks testified that when she cut checks, she knew to whom and how much the check should be by the invoices provided to her. If there was no invoice, Sidhu or the JOHA president would tell her to write the check and provide her the required information. After she prepared a check, she would place it on the desk that Pundaleeka and Sidhu shared. Once Pundaleeka or

Sidhu signed the check, they would return it to her to record before distributing the check to the appropriate recipient. In 2018, Sidhu directed her to stop writing checks from the leasing entities to JOHA. She did not know if JOHA ever transferred money electronically, because she did not have access to the bank accounts.

¶ 28    Pundaleeka testified that he hired Sidhu, and that Sidhu managed all the entities that were created after he was hired, which included the leasing entities. Sidhu also assisted with at least a dozen other business ventures not associated with JOHA.

¶ 29    Pundaleeka also testified that, according to the terms of JOHA's income pool agreement, any funds in excess of what the lease agreements prescribed would be returned to JOHA and classified as income to split among the partners. Pundaleeka delegated to Sidhu the task of determining the amount to be returned to JOHA. Pundaleeka stated that he never authorized anyone to transfer money from the leasing entities to JOHA but that he left it up to Sidhu as administrator to handle. He believed that Sidhu knew by JOHA's meeting minutes that whatever amount in excess paid by Provena to JOHA Realty should be returned to JOHA. He did not remember any conversations with Sidhu relating to the excess rent given to Midwest. As for Jefferson, he acknowledged that there was no written agreement regarding the excess money, but he knew that any excess money would be returned to JOHA.

¶ 30    Normally Sidhu signed the checks, but Pundaleeka testified he also signed checks occasionally. He stated that he did not pay attention to what the checks he signed were for and assumed they were pursuant to whatever agreement JOHA had with the leasing entities. He testified that he was not aware of Midwest or Jefferson paying JOHA, only that JOHA Realty returned excess rent to JOHA. When he became aware of the transfers and their amounts in May 2018, he called the bank to tell it to stop the transfers. He admitted that Sidhu did not keep

10

records from him and that if he had wanted to look at the payment records, he could have seen them at any time.

¶ 31 Dr. Kulumani Sivarajan was JOHA's president from 2016 to 2018. He testified that when Provena took assignment over the leases, JOHA's partners held a meeting and agreed to share the extra monies received. He did not know what that sum would be. He did not have check-writing authority for the leasing entities but did sign checks for JOHA. He did not recall ever having any conversations with Pundaleeka regarding money coming to JOHA from the leasing entities outside of the partners' meeting in 2012.

¶ 32 Dr. Sanjiv Modi testified that he was a physician at JOHA and began serving as president in 2022 and held an interest in all three leasing entities. He testified that as a member of JOHA and an owner of the other three entities, he agreed to the payments at issue in this case. To his knowledge none of the other owners ever complained about those payments until this lawsuit was filed. Prior to filing the lawsuits, Pundaleeka never held a meeting to ask for the leasing entities' approvals. He further stated that he did not agree with the lawsuit.

¶ 33 Sidhu's testimony was admitted via deposition transcripts. He testified that Pundaleeka hired him as the JOHA administrator in May 2001. He remained administrator until JOHA was sold to Du Page Medical Group in March 2021, and then remained employed by Du Page. His responsibilities for JOHA included day-to-day management, staffing, communicating with attorneys and accountants, and business development.

¶ 34 When Midwest, Jefferson, and JOHA Realty were created, Pundaleeka requested that Sidhu oversee their operations. Pundaleeka created Midwest and Jefferson for the purpose of buying medical equipment to lease to JOHA. JOHA had lease agreements with both Midwest

11

and Jefferson, and Sidhu's duties included overseeing payments from JOHA and making any necessary payments from Midwest and Jefferson to financial institutions.

¶ 35    Sidhu testified that any checks he told Franks to write were at the instruction of Pundaleeka. Pundaleeka would tell Sidhu the amount, which he would then relay to Franks. He also testified that Pundaleeka was very particular about his entities' bank accounts. Pundaleeka kept a close watch on all banking activity and monitored the activity daily. Pundaleeka would discuss the balances with Sidhu and direct him on how to distribute the money. Further, Pundaleeka was aware of the checks that Sidhu wrote on behalf of Midwest and Jefferson. He retained check-writing authority for the entities until May 2018 when Pundaleeka filed suit against JOHA.

¶ 36    After Pundaleeka left JOHA and another owner became president, Sidhu continued making transfers because the payments to the leasing entities continued. Sidhu stated that any action he took to write checks among the entities was under Pundaleeka's direction and that Sidhu himself did not have any discretion to do anything Pundaleeka did not authorize.

¶ 37    On March 22, 2022, the court issued a written decision denying all claims and counterclaims. The court held that with respect to plaintiffs' breach of contract claims, Sidhu's transfer of payment to each leasing entity and the transfer of funds back to JOHA created two separate transactions. With regard to the breach of contract claim, the court found that the rents were all actually paid. Further, the plaintiffs did not provide notice of default or demand for payment. The first transaction of transferring the rent payments to the leasing entities satisfied the rent obligations JOHA had for each plaintiff. Regarding the unjust enrichment claims, the court found that the plaintiffs failed to prove their claims and that the claims were further defeated by the fact that the payments made to JOHA by the plaintiffs were voluntary.

¶ 38      The court also found JOHA's counterclaims that it was owed monthly payments of excess rent failed because it did not provide any writing to prove such an obligation. As the court already determined that unjust enrichment did not apply in this case and that the voluntary payment doctrine barred recovery, it determined that JOHA had no right to any claims against the leasing entities. Further, as there was no recovery for the underlying charges, the court dismissed the third-party claims against Pundaleeka as moot.

¶ 39      Plaintiffs appealed, and JOHA filed a cross-appeal.

¶ 40                                 II. ANALYSIS

¶ 41      On appeal, plaintiffs argue several theories regarding the circuit court's decisions after the bench trial. We address each issue against each defendant in turn.

¶ 42                            A. Claims Against Sidhu

¶ 43      We will first address the issues on appeal that pertain to Sidhu. Plaintiffs argue that the circuit court erred by dismissing their claims against Sidhu. Specifically, the leasing entities argue that the court should not have dismissed their claims against Sidhu for breach of fiduciary duty because each of the required elements to satisfy the claim was established. Plaintiffs make a similar argument regarding their negligence claims against Sidhu. Included in their brief is an argument that the court erred in dismissing a conversion claim against both JOHA and Sidhu; however, no conversion claim was ever alleged against Sidhu. We therefore will not address any conversion claim as it relates to Sidhu.

¶ 44      By the time trial commenced, the plaintiffs' operative pleadings were their second amended complaints. JOHA Realty never alleged any claims against Sidhu. Previously, Midwest and Jefferson had alleged claims against Sidhu for breach of fiduciary duty in their first amended complaint, which were dismissed by the circuit court after a hearing. In their second amended

13

complaint, Midwest and Jefferson chose not to replead breach of fiduciary duty claims against Sidhu, but instead alleged fraudulent concealment and negligence. After a hearing on a second motion to dismiss, the court dismissed the negligence counts "with prejudice and without leave to replead." Prior to trial, Midwest and Jefferson voluntarily dismissed the counts alleging fraudulent concealment. Therefore, when the trial began, there were no viable claims against Sidhu.

¶ 45 "The rules governing the preservation of dismissed claims for purposes of appellate review are clear and well settled." *Bonhomme v. St. James*, 2012 IL 112393, ¶ 17. A party has three methods available for preserving those dismissed claims for appellate review. *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 719 (2010). First, a party can take a voluntary dismissal of any remaining counts and take an immediate appeal. *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 36. Second, the party can file an amended pleading that realleges, refers to, or incorporates by reference the dismissed count. *Id.* Finally, a party can perfect an appeal from the dismissal order before filing an amended pleading. *Id.* Where a party has not employed any of these methods, it has failed to preserve the issue on appeal. *Bonhomme*, 2012 IL 112393 ¶¶ 20-22.

¶ 46 Midwest and Jefferson, when filing their second amended complaint, did not refer to or adopt the previously dismissed breach of fiduciary duty claim. Moreover, at no point after the court dismissed the negligence claim did Midwest and Jefferson perfect an appeal on that count. Having employed none of the methods described above, the plaintiffs have waived review of any claims against Sidhu.

¶ 47                                  B. Claims Against JOHA Members

14

¶ 48    The plaintiffs also argue that the court erred in dismissing their unjust enrichment claims against JOHA's shareholders. However, these claims were alleged in the leasing entities' second amended complaints and were then dismissed by the court prior to trial. Much like plaintiffs' negligence claims against Sidhu, these claims were not perfected for appeal. See *supra* ¶¶ 45-46. Thus, plaintiffs have waived review of this claim.

¶ 49                            C. Claims Against JOHA

¶ 50    Next, plaintiffs argue the circuit court made several errors regarding their claims against JOHA. Specifically, the plaintiffs make arguments regarding the decisions on their claims of breach of contract, conversion, unjust enrichment, and negligence.

¶ 51                            1. Breach of Contract

¶ 52    First, the plaintiffs argue that the circuit court erred in its decision that the plaintiffs failed to prove JOHA breached the lease agreements. They contend that the court's decision that the obligations under the lease were met because JOHA paid the rent in full before transferring anything from the leasing entities back to JOHA is flawed because the plaintiffs ultimately received less than what was agreed to in their lease agreements.

¶ 53    The court's finding of whether a breach of contract has occurred is a question of fact that will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Covinsky v. Hannah Marine Corp.*, 388 Ill. App. 3d 478, 483 (2009). We give such deference to the court because, "[t]he trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." *Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 356 (1967). A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Z.L.*, 2021 IL 126931, ¶ 61.

15

¶ 54    To prove a breach of contract, plaintiffs were required to show the existence of a contract, performance by the plaintiff, breach by the defendant, and damages as a consequence of that breach. *Lindy Lu LLC v. Illinois Central Railroad Company*, 2013 IL App (3d) 120337, ¶ 21. There is no dispute here that a contract existed or that the plaintiffs did not fulfill their obligations under the lease agreements. The only dispute is whether JOHA breached the lease agreement when, after transferring the rents into the leasing entities' accounts, it transferred more than the excess back to its own account, leaving the leasing entities with an amount less than the agreed upon rent payments.

¶ 55    The circuit court's finding that the plaintiffs failed to prove that JOHA breached the lease was not against the manifest weight of the evidence. First, the lease payments were, in fact, paid. The circuit court found that the leasing entities received their monthly payments, including the excess rents, every month. It was not until after those rents were paid that Sidhu transferred funds back to JOHA. Thus, the obligations under the lease agreements were fulfilled prior to any "take-backs."

¶ 56    Plaintiffs argue that the "take-backs" were more than the excess payments, therefore, JOHA was not entitled to the additional income taken, breaching the agreements the parties had regarding the excess rents. However, in their complaints, plaintiffs specifically allege a breach of the lease agreements, not any other agreement pertaining to the excess rents. Any agreement among the parties regarding the excess rents is a different agreement entirely and not the subject of the plaintiffs' complaints or of this appeal.

¶ 57                                    2. Statute of Frauds

¶ 58    The plaintiffs next assert that the court erred when it refused to apply the Statute of Frauds to bar any assertion that the lease agreement was modified. It has long been understood

16

that when a contract is required to be in writing by the statute of frauds, any amendment to that contract must also be in writing. *National Importing & Trading Co. v. E.A. Bear & Co.*, 324 Ill. 346, 357 (1927). Plaintiffs argue that the oral agreement among the parties to transfer the excess rents back to JOHA constituted an amendment to the leases and that the statute of frauds required this amendment to be reduced to writing.

¶ 59        This contention is without merit. As we have already discussed, the arrangements between JOHA and the leasing entities to give JOHA the excess rent were not amendments to any written leases for property and equipment. *Supra* ¶ 56. Instead, the arrangement's purpose was to fulfill an agreement that the parties made to compensate the partners in JOHA for giving up income as a result of the PSA. These agreements are wholly separate from the lease agreements and thus not an amendment to a written document that would trigger the statute of frauds.

¶ 60        Further, applying the voluntary payment doctrine, the plaintiffs cannot be heard to complain about payments which they voluntarily made to JOHA. See *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 12326, ¶ 22 (finding that to avoid application of the voluntary payment doctrine, there must be a showing that the payment was not voluntary). The circuit court's findings make it clear that Pundaleeka, as president, founder, and manager of the plaintiffs, knew about and approved of the payments. The findings of the circuit court are fully supported by the record; therefore, we find no error here.

¶ 61                                    3. Unjust Enrichment

¶ 62        Next, plaintiffs argue that the court erred in dismissing plaintiffs' unjust enrichment claims. To prevail on a claim for unjust enrichment, the plaintiffs must prove: (1) defendant retained a benefit, (2) this was to the plaintiffs' detriment, and (3) defendant's retention of such

17

benefit violates fundamental principles of justice and equity. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc*., 131 Ill. 2d 145, 160 (1989).

¶ 63    The issue here is whether JOHA violated fundamental principles of justice and equity when it received the transfers from the plaintiffs. To prove that the retention of a benefit constituted unjust enrichment, plaintiffs must show that the benefit should have been given to plaintiff but a third-party gave it to the defendant by mistake, the defendant procured the benefit from a third party through wrongful conduct, or that the plaintiff had a better claim to the benefit than defendant. *Hatcher v. Hatcher*, 2020 IL App (3d) 180096, ¶ 15. Of these, the only argument plaintiffs could make is that they had a better claim to the benefit than defendants. However, the circuit court found that the plaintiffs were created solely to benefit JOHA, and it is not against the manifest weight of the evidence to find that JOHA should receive the benefits that it did.

¶ 64    The court found that Pundaleeka, who was effectively in charge of all the entities, was aware of the transfers of funds among his entities, because all payments were made by either Pundaleeka or his authorized delegates. It further found that the plaintiffs were created specifically to enrich JOHA. Because the person in charge of the entities approved the revenue sharing arrangement, the court did not find unjust enrichment applied.

¶ 65    When concluding that the plaintiffs failed to meet their burden of proof, the trial court found that Pundaleeka clearly was the entrepreneur who started the entities, recruited other physicians, negotiated his own management fees as manager of the entities, and negotiated with Provena for the PSA. He signed the tax returns for the businesses. Pundaleeka negotiated on behalf of himself and his JOHA partners in 2011 with Provena to make up the income pool and to benefit himself and the other JOHA physicians. Pundaleeka knew that the excess funds coming into Midwest, Jefferson, and JOHA Realty, would be given to JOHA to make up the

18

income pool. It strains credulity to think that Pundaleeka was not aware of what was going on in the businesses.

¶ 66     Further, JOHA's partners all agreed to the income pool. The managing members of Midwest, Jefferson, and JOHA Realty, along with most of the members agreed to the payments going to JOHA. No complaints were made by any entity until Pundaleeka filed these lawsuits and stopped payments. The payments were approved, made by, and accepted by Pundaleeka or by his delegates prior to that date. The reimbursements were clearly part of a plan agreed upon by JOHA's partners and Pundaleeka to keep the partners in JOHA from losing income as a result of entering into the PSA with Provena. It was not improper for the court to decline to find unfairness when Pundaleeka, the president of the entities, knew about the reimbursements and implicitly approved of them by signing some of the checks himself. The court found that Dr. Pundaleeka was actively involved with the payment transfers and directed them. Therefore, its refusal to impose an implied contract and find unjust enrichment was not in error.

¶ 67     The plaintiffs further contend that the court misapplied the voluntary payment doctrine to their claims of unjust enrichment. In its order, the court stated that "even if a claim of unjust enrichment were appropriate, the voluntary payment doctrine would apply to bar recovery." As we have determined that the circuit court did not err in deciding that unjust enrichment did not apply under these circumstances, we do not reach whether the voluntary payment doctrine applies here.

¶ 68                              4. Conversion and Negligence

¶ 69     Plaintiffs argue that the court erred in dismissing their conversion and negligence claims. The conversion claims were initially filed in Midwest's and Jefferson's first amended complaint and dismissed by the court after hearing. Midwest and Jefferson did not refer to or adopt this

19

claim when they filed their second amended complaint. See *Gaylor*, 2012 IL App (2d) 110718, ¶ 36 (finding that to avoid waiver of a dismissed count on appeal, plaintiff must incorporate the dismissed count in an amended pleading, appeal directly, or perfect an appeal before repleading). JOHA Realty initially filed a negligence claim against JOHA, but it voluntarily dismissed the claim prior to trial. Midwest and Jefferson included counts of negligence in their second amended complaint, which were dismissed by the circuit court after JOHA's motion to dismiss. We have already discussed above how Midwest and Jefferson failed to perfect an appeal as to the negligence claims against Sidhu, and the same principles apply here. *Supra* ¶¶ 45-46. Thus, plaintiffs did not preserve either of these claims on appeal and have waived any argument regarding the court's dismissal of these counts.

¶ 70                                           D. Cross-Appeal

¶ 71           JOHA's counterclaim alleged that it entered into agreements with the leasing entities after it executed the PSA with Provena. This agreement addressed how the parties would handle the excess rent payments, specifically allocating those excess funds to JOHA. JOHA argued that the plaintiffs stopped paying it for the excess rent when it filed suit, therefore the plaintiffs owed JOHA for the missed payments from the time this cause began. The circuit court, in its written decision following the bench trial, found that no writing existed to establish that those payments were agreed upon. It further found that it had already determined that unjust enrichment did not apply in this matter, and thus the counterclaim must fail, just as the leasing entities' unjust enrichment claims failed.

¶ 72           On cross-appeal, defendant first argues that they sufficiently showed writings that established enforceable agreements with the plaintiffs. JOHA argues that board resolutions outlining the payment scheme and the third amendment to the lease created a written agreement

20

binding the plaintiffs to pay JOHA the additional income made from the leases with Provena. However, the amendment to the lease agreement does not state that JOHA is to receive the additional rents; it states that if the agreement with Provena terminates, JOHA's rent would be lowered according to the chart provided. Additionally, the productivity model created by JOHA to memorialize the plan for its income pool did not create an agreement between JOHA and the plaintiffs. JOHA attempts to argue that because the entities shared shareholders, the entities essentially agreed to the arrangement because shareholders were aware of the parties' intentions with the excess rents. However, this does not establish a written agreement between the parties.

¶ 73 JOHA also argues that the court erred in its judgment that it could not prevail on its counterclaims because it was not unjustly enriched. It argues that, based on the court's analysis of plaintiffs' unjust enrichment claims, it should have found the opposite for JOHA's claims. JOHA contends that if it was not unjustly enriched by receiving the excess rents, then the plaintiffs must have been unjustly enriched by keeping those payments. While the circuit court determined that unjust enrichment did not apply to JOHA's counterclaims, JOHA did not allege unjust enrichment in its counterclaims. The only claim alleged against the plaintiffs was breach of contract. JOHA cannot now argue that the circuit court erred for not finding in its favor for a claim that it never brought before the court. Because JOHA did not present sufficient evidence to prove a contract existed and no unjust enrichment claim was ever alleged, the court's finding that the plaintiffs did not breach such a contract is not against the manifest weight of the evidence and we therefore affirm the circuit court's ruling.

¶ 74                                III. CONCLUSION

¶ 75 The judgment of the circuit court of Will County is affirmed. Further, Sidhu has requested sanctions for the filing of a frivolous appeal. Illinois Supreme Court Rule 375(b) (eff.

21

Feb. 1, 1994) ("If *** it is determined that the appeal or other action itself is frivolous or *** not taken in good faith, *** an appropriate sanction may be imposed"). Considering the circumstances surrounding the claims against Sidhu on appeal, this court finds sanctions appropriate, specifically in the form of attorney fees. *Id.* Sidhu's attorneys are directed to file a fee petition with this court within 30 days, and plaintiffs are given 30 days to file a response.

¶ 76          Affirmed.